# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

FILED

JUN 28 ----

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFOR...

C   22   03828 NC

LARRY GOLDEN

*Pro Se* Plaintiff,

V.

INTEL CORPORATION.

Defendant.

CASE NO: _____

**(JURY TRIAL DEMANDED)**

**(Sherman Act) (The Clayton Act) (Unjust Enrichment) (Contributory Infringement).**

June 27, 2022

## COMPLAINT FOR ANTITRUST LAW VIOLATIONS AND PATENT INFRINGEMENT

This is a civil action brought under Antitrust Law violations commencing from competitor collaborations, conspiracy to restrain trade, and the illegal formation or maintenance of a monopoly, which likely resulted from a secret conspiracy and the anticompetitive practices recognized by this Court.

COMPLAINT

This action is also brought under Contributory Infringement commencing from the "manufacture, combination or composition; or, a material or an apparatus for use in practicing a patented process, constituting a material part of the invention".

This action is for damages and injunctive relief on behalf of the Plaintiff, against the defendant Intel Corporation. ("Intel"); demanding a trial by jury, complains and alleges as follows:

## NATURE OF THE CASE

1.      This enforcement action challenges Intel's unlawful maintenance of a monopoly formed with Intel's alleged infringing central processing units (CPUs) that processes functional and operational instructions for Plaintiff's patented new, useful, and improved upon laptops, desktop PCs, cell phones, and stall, stop, and vehicle slowdown systems.

2.      Intel has engaged in exclusionary conduct that reduces competitors' ability and incentive to innovate, and raises prices paid by consumers for Plaintiff's patented new, useful, and improved upon laptops, desktop PCs, cell phones, and stall, stop, and vehicle slowdown systems. Intel is a dominant supplier of central processing units (CPUs) for laptops; desktop PCs.

3.      Intel's customers in the CPU product market are OEMs, alias original equipment manufacturers, alias laptop and computer makers. OEMs compete with each other in various downstream markets, such as the laptop or desktop personal computer (or PC), which for present purposes we can assume to be substantially competitive.

4.      In order for Intel to produce a valuable end-product for consumers, these OEMs must produce software and machines [laptop or desktop personal computer (or PC)] that integrate with the Intel's CPU technology that they buy.

5.      In order to enable OEMs to produce the laptops and PCs in a sufficiently timely manner to be able to compete effectively in the fast-evolving laptop and computer market, and in order to facilitate simultaneous roll-out of new Intel CPU technology by multiple OEMs; Intel's general practice is supply at least major, or "strategic," OEMs with advance technical information and prototype CPUs on a rolling basis.

6.      Intel's '*contributory infringement*' commence from the "manufacture … of the patented CPUs, as an apparatus for use in practicing a patented process of making the patented laptops and desktop PCs; the CPU constitute a material part of the invention"

7.      Intel has excluded competitors and harmed competition through interrelated policies and practices.

8.      Intel continues to condition benefits to computer makers in exchange for their promise to buy chips from Intel exclusively or to refuse to buy chips from others (*FTC v. Intel*, 2010).

9.      Intel continues its retaliation against computer makers if they do business with non-Intel suppliers by withholding benefits from them (*FTC v. Intel*, 2010).

10.      Intel has unjustly enriched itself with the unauthorized use of Plaintiff's patented CPU(s), Plaintiff's patented new and improve laptops and desktop PCs; and, Plaintiff's patented stall, stop, and vehicle slowdown systems [driver assistance system for the driverless, self-drive, and autonomous vehicle].

11.      Intel's conduct has harmed competition and the competitive process. At a time when computer technologies are expanding to new and varied applications, Intel's practices threaten further consumer harm in an industry in which competition and innovation are vitally important.

COMPLAINT

## JURISDICTION AND VENUE

12.     This complaint is filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), to recover triple damages, injunctive relief, and costs of suit; for violation of Section 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2; conspiracy in the restraint of trade and single-firm violations).

13.     This Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26).

14.     Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because defendant reside, transact business, or are found within this District, and a substantial part of the events giving rise to the claims arose in this District.

15.     For patent litigation cases, the venue statute, 28 U.S.C. §1400(b), provides "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business."

16.     The activities of the Defendant, as described herein, were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.

**Intradistrict Assignment**

17.     Assignment to the San Jose Division is proper. The actions arose in Santa Clara County because a substantial part of the events giving rise to these claims occurred in Santa Clara County. Intel has offices in Santa Clara and San Jose. Third parties that have information relevant to this action, including leading laptop and desktop PC manufacturers (also known as

"original equipment manufacturers" or "OEMs") and Intel competitors, also have offices in Santa Clara County.

## RELATED CASES

18.     Plaintiff has an Antitrust case pending in the United States District Court for the Northern District of California (Oakland); *Golden v. Qualcomm, Inc.*; Case No.: 4:22-cv-03283-KAW; Kandis A. Westmore is the Presiding Magistrate Judge. The cases are very similar in nature because Intel **(Exhibit A)** and Qualcomm were both notified in 2010 of Plaintiff's offer to license Plaintiff's intellectual property; both have had additional opportunities to enter into licensing agreements; both have formed or maintained a monopoly by either using, making, offering for sale, or selling Plaintiff's patented inventions; both have negotiated agreements with the OEMs to use, make, offer for sale, or sell Plaintiff's patented inventions; both received a benefit from the Plaintiff; and, both were unjustly enriched at the Plaintiff's expense. The term "benefit" means any type of advantage. (*Federal Deposit Ins. Corp. v. Dintino* (2008) 167 Cal.App.4th 333, 347.) receipt of a benefit and unjust retention of the benefit at the expense of another." (*Lyles v. Sangadeo-Patel* (2014) 225 Cal.App.4th 759, 769.)

## THE PARTIES

19.     Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business (ATPG Technology, LLC), and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607. Plaintiff is the author of three economic stimulus packages submitted to Government beginning in year 2003. The success of the packages was dependent on the development of certain intellectual property technology that is owned by the Plaintiff, and is asserted in this case (i.e., Communicating, Monitoring, Detecting, and Controlling (CMDC) devices; Central

Processing Units (CPUs) for New and Improved Cell Phones; and, Stall, Stop, and Vehicle

Slow-Down Systems (SSVSS). **Exhibits B-H; '497, '752, '189, '439, '287, '619, '891 patents**

20.    On information and belief, Intel is a California corporation with a principal place

of business at 2200 Mission College Blvd, Santa Clara, CA 95054 and does business in this

judicial district. Intel has offices in Santa Clara, CA and San Jose, CA.

21.    Intel's unjust enrichment of profits, resulting from a violation of antitrust laws;

anticompetitive practices; conspiracy in restraint of trade; direct infringement; and contributory

infringement, give rise to this complaint. Intel's monopolization and attempted monopolization

violations require no agreement as Section 1 violations do. *E.g., Spectrum Sports, Inc. v.

McQuillan*, 506 U.S. 447, 454 (1993) (explaining that "while § 1 . . . forbids contracts or

conspiracies . . ., § 2 addresses the actions of single firms that monopolize or attempt to

monopolize"). They are "single-firm" violations.

22.    According to Statista, "Intel's net revenue from 2011 to 2021 is $693.07B".

https://www.statista.com/statistics/263559/intels-net-revenue-since-1999/. Intel can be served at

2200 Mission College Blvd, Santa Clara, CA 95054.


## STATEMENT OF FACTS:

## INTEL'S KNOWLEDGE OF PLAINTIFF'S
## CENTRAL PROCESSING UNITS (CPUs) & "UNJUST ENRICHMENT"

23.    Plaintiff's claim for unjust enrichment requires the Plaintiff to show that: (1)

Plaintiff conferred a benefit onto Intel; (2) Intel had appreciation or knowledge of the benefit;

and (3) the acceptance or retention of the benefit was under such circumstances as to make it

inequitable for Intel to retain the benefit without payment of its value.", *Platz Associates v.

Finley*, 973 A.2d 743, 750 (2009). The unjust enrichment occurred when Party A (Plaintiff)

conferred a benefit upon Party B (Intel) without Party A (Plaintiff) receiving the proper restitution required by law.

24.    On 12/16/2010: Plaintiff's notice letters and licensing offer was mailed U.S. Postal Service, Certified Mail to Mr. Paul S. Otellini, President & CEO Intel, and Mr. Curt J. Nichols, VP Intel Capital Intel, at Mission College Blvd., Santa Clara, CA 95054-1549. Intel received and signed for the letters 12/20/2010. Phone: 408-765-8080. Tracking Nos: 7010 1870 0002 0193 0360 and 7010 1870 0002 0193 0377. **(Exhibit A)**

25.    In Plaintiff's most recent correspondence on June 10, 2022 **(Exhibit I)**, Intel denied having knowledge of the letters, "[r]egarding the certified mail you say Intel received on December 20, 2010, we have searched for the letter but we have not been able to locate it.

26.    The US District for the Eastern Court of Texas in *Motiva Patents, LLC v. HTC Corporation,* E.D. Texas, 9:18-cv-00179 (Oct. 2019), ruled that having a policy of ignoring others' patents is sufficient grounds to support claims of willful patent infringement.

27.    The Eastern District Court found HTC's policy of ignoring others' patents opened the door for support of Motiva's assertions that HTC willfully infringed upon Motiva's patents. The court stated that intentionally being blind to the facts was essentially the same as knowing about a competitor's patent and infringing on it anyway.

28.    The basic principle of "ignorance of the law is no excuse" applies to patent infringement—as the defendant in a Texas patent case discovered.

29.    The scope of Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices was challenged in an *Inter Partes Review* (IPR) and was found to be acceptable because "[t]he specific devices [a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal at a monitoring site for monitoring products for

communication thereebetween], such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."

> *UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner.* IPR Case IPR2014-00714 Patent RE43,990 E Before LORA M. GREEN, JON B. TORNQUIST, and KEVIN W. CHERRY, Administrative Patent Judges. CHERRY, Administrative Patent Judge. FINAL WRITTEN DECISION 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 "Beginning with the claim preamble amendment, the preamble of claim 11 originally read: "A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal at a monitoring site for monitoring products for communication thereebetween, comprising...." In claim 154, the language in italics has been eliminated and replaced with "the products grouped together by common features in the product groupings category of design similarity (e.g., computer terminal, personal computer (PC)) ...." Patent Owner contends that this new language is consistent with words found in the disclosure of the '118 application. Mot. To Amend 4. Patent Owner further contends that this new language is broad enough to include the removed items, such as cell phones and smart phones, because those items are "species terms" that are "included in the genus 'monitoring equipment' and 'communication device' when the clause 'products grouped together by common features in the product groupings category of design similarity' is included." Id. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." *Id*



**Claim 14 of the '439 Patent**: "Monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a product for communication therebetween, the monitoring equipment …

**Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., laptop; PC)**

**Claim 13 of the '439 Patent**: "A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising:
        at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program …

*Specifications*: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals…

*Specifications*: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, …, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite phones, cell phones, … handhelds;

30.     Plaintiff believes Intel has unjustly enriched itself [the doctrine of unjust enrichment allows a plaintiff to recover from a defendant, without the benefit of an enforceable contractual obligation, where the defendant has unfairly benefited from the plaintiff's efforts without compensation] by using Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices (i.e., "[a] communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal at a monitoring site for monitoring products for communication therebetween, comprising…."; and, Plaintiff's central processing units (CPUs), i.e., the "brains" of the CMDC devices. No CMDC device—laptop or desktop PC—can function without at least one central processing unit (CPU).

31.     Plaintiff believes the laptops and desktop PCs Intel has "used without

authorization"; and, the central processing units (CPUs) Intel has made, offered for sale, and sold

since receiving knowledge of Plaintiff's intellectual property and patents (2010); Intel generated

hundreds of billions of dollars in revenue. Plaintiff believes Intel mass marketed Plaintiff's

patented inventions of a new and improved laptop, a new and improved desktop PC, and a new

and improved CPU made for Plaintiff's CMDC devices, to prevent market entry.

32.     Plaintiff believes Intel is in violation of Section 2 of the Sherman Act, because

Intel maintained a specific intent to monopolize both current and future generations of laptops,

desktop PCs, and CPUs.



**Claim 1 of the '619 Patent**: A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of … processing instructions …

**Central Processing Units (CPUs) for**

**Claim 5 of the '287 Patent**: A monitoring device, comprising: at least one central processing unit (CPU) … at least one of a transmitter or a transceiver in communication with the at least one CPU … such that the communication device is capable of communicating, monitoring, detecting, and controlling.

The "central processing unit (CPU), [chipset], is a component that controls everything in smartphones [laptops; desktop PCs] and ensures it functions correctly. It can be compared to the human brain. Every action perform goes straight to the processor." https://www. coolblue.nl/en/advice/smartphone-processors. html. "… CPU (central processing unit) is the brains of the entire device. Without one, no [laptop; desktop PC] would be able to function" (smartphonedomain.com., 2021).

33.     Intel, a monopolist, has excluded Plaintiff and its competitors, and has established

market dominance for CPUs through its anticompetitive practices. Plaintiff is alleging that since

Intel was given notice (12/2010) of the operational and functionality of Plaintiff's CPUs, Intel

has rushed the OEMs to produce laptops and desktop PCs that integrate with the CPU

technology.

## <u>PLAINTIFF OWNS THE RIGHT TO EXCLUDE INTEL FROM USING, MAKING, OFFERING FOR SALE, AND SELLING PLAINTIFF'S PATENTED INVENTIONS TO FORM OR MAINTAIN ITS MONOPOLY</u>

34.     In a related case, *Golden v. US*, COFC case no. 13-307C, Plaintiff demonstrated he owns the rights to the new, useful, and improved upon CMDC devices of a laptop, a desktop (PC), a cell phone, and a central processing unit. Plaintiff was ordered to present preliminary infringement contentions charts for the alleged ten infringing products of Apple; the alleged nine infringing products of Samsung; and, the alleged nine infringing products of LG.

35.     Plaintiff presented over 1900 pages of claim charts to show Apple, Samsung, and LG directly infringed, and infringed under the 'doctrine of equivalents', Plaintiff's claim 1 of the '497 patent; claim 10 of the '752 patent; claims 1-9 of the '189 patent; claims 13-23 of the '439 patent; and, claims 4-6 of the '287 patent. **(Exhibits B-F)**

36.     Plaintiff's twenty-five (25) independent patent claims presented in the *Golden v. US*, COFC case no. 13-307C, were "*comprising*" claims. The patent claims cover what the CMDC device of a laptop, a desktop (PC), a cell phone, and a central processing unit actually does.

37.     Plaintiff is including in this complaint claims 1-20 of Plaintiff's '619 patent to demonstrate what the CMDC device of a laptop, a desktop (PC), a cell phone, and a central processing unit is "*capable of*".

38.     Where a claim recites that a structure is "capable of" a particular function, the phrase "capable of" encompasses structures that are capable of the function during the course of a *use* that is intended by the patent, as well as structures that are capable of accomplishing tasks through misuse or incidental use.

COMPLAINT

39.     Functional elements using "capable of-type" language include recitations of "wherein the device is capable of," "wherein the device is configured for," and "wherein the device is adapted for."

40.     Intel's task is to produce a device(s) that is "capable of" performing the same function as Plaintiff's "capable of" patent claims (claims 1-20 of Plaintiff's '619 patent) for Plaintiff's patented CMDC devices (i.e., laptops, personal computers (PCs)), and Plaintiff's patented Central Processing Units (CPUs); or, produce prior art references that antedates Plaintiff's patents.

41.     Claims 1-20 of Plaintiff's '619 patent: **(Exhibit G)**

1.     A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), *capable of*:
processing instructions to lock, unlock, or disable the lock of the communication device;
processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob;
processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system;
processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle;
processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition;
processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC);
processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;
processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);
processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission;
processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a

building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and,

      whereupon, the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory.

2.    The communication device of claim 1, comprising at least a central processing unit (CPU), *capable of* processing operational instructions for at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner.

3.    The communication device of claim 1, comprising at least a central processing unit (CPU), *capable of* receiving a signal to lock, unlock, or disable the lock of the communication device.

4.    The communication device of claim 1, comprising at least a central processing unit (CPU), *capable of* receiving a signal of at least fingerprint recognition, facial recognition, iris recognition, or retina recognition.

5.    The communication device of claim 1, comprising at least a central processing unit (CPU), *capable of* receiving a signal of at least short-range wireless radio frequency near-field communication (NFC).

6.    The communication device of claim 1, comprising at least a central processing unit (CPU), *capable of* receiving a signal from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor.

7.    The communication device of claim 1, comprising at least a central processing unit (CPU), *capable of* receiving a signal from at least one of chemical, biological, radiological, nuclear, or explosives detection.

8.    The communication device of claim 1, comprising at least a central processing unit (CPU), *capable of* receiving a signal through at least a Bluetooth, a Wi-Fi, a satellite, a cellular, or GPS connection.

9.    The communication device of claim 1, comprising at least a central processing unit (CPU), *capable of* receiving a signal of the communication device connection to the internet or internet-of-things (IoTs) platform to sync at least a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device.

10.    The communication device of claim 1, comprising at least a central processing unit (CPU), *capable of* receiving a signal of the operational and functional execution of instructions; capable of providing feedback of the execution; and, capable of storing the feedback into memory.

11.    A central processing unit (CPU) of at least a personal computer (PC), a
cellphone, a smartphone, a laptop, or a handheld scanner, *capable of*:

processing instructions to lock, unlock, or disable the lock of the
communication device;

processing instructions to activate a lock, unlock, or disabling lock means
by engaging a vehicle with a two-way communication key-fob;

processing instructions to activate a start, stall, stop, or disabling means by
engaging a vehicle's ignition system;

processing instructions to activate a lock, unlock, or disabling lock means;
a start, stall, stop, or disabling vehicle means by engaging the operational systems
of the unmanned aerial vehicle;

processing instructions to authenticate or identify a user by at least one of
biometric fingerprint recognition, biometric facial recognition, biometric iris
recognition, or biometric retina recognition;

processing instructions to scan a senor or tag using the short-range
wireless technology of radio frequency near-field communication (NFC);

processing instructions to monitor or detect at least one of a chemical
sensor, a biological sensor, a motion sensor, a biometric sensor, a signature
sensor, or a human sensor;

processing instructions to monitor or detect for at least one of chemical
agent, biological agent, radiological agent, nuclear agent, or explosive agent,
weapons of mass destruction (WMDs);

processing instructions received through at least one of a Bluetooth, a Wi-
Fi, a satellite, a global positioning system (GPS), or a cellular transmission;

processing instructions to connect the communication device to the
internet or internet-of-things (IoTs) platform to sync, to at least one of a building's
computer or security system, a vehicle's computer or security system, a lock, a
detection device, or another communication device; and,

whereupon, the central processing unit (CPU) of the communication
device is capable of processing instructions for operational and functional
execution, and is capable of providing feedback of the execution, and storing the
feedback into memory.

12.    The central processing unit (CPU) of claim 11, *capable of* processing
operational instructions for at least one of a personal computer (PC), a cellphone,
a smartphone, a laptop, or a handheld scanner.

13.    The central processing unit (CPU) of claim 11, *capable of* processing
operational instructions to lock, unlock, or disable the lock of the communication
device.

14.    The central processing unit (CPU) of claim 11, *capable of* processing
operational instructions of at least fingerprint recognition, facial recognition, iris
recognition, or retina recognition.

COMPLAINT

15.     The central processing unit (CPU) of claim 11, *capable of* processing operational instructions from short-range wireless radio frequency near-field communication (NFC).

16.     The central processing unit (CPU) of claim 11, *capable of* processing operational instructions from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor.

17.     The central processing unit (CPU) of claim 11, *capable of* processing operational instructions from at least chemical, biological, radiological, nuclear, or explosives detection.

18.     The central processing unit (CPU) of claim 11, *capable of* processing operational instructions through at least a Bluetooth, a Wi-Fi, a satellite, a cellular, or GPS connection.

19.     The central processing unit (CPU) of claim 11, *capable of* processing operational instructions of the communication device connection to the internet or internet-of-things (IoTs) platform to sync at least a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device.

20.     The central processing unit (CPU) of claim 11, *capable of* processing operational instructions of functional execution of instructions; capable of providing feedback of the execution; and, capable of storing the feedback into memory.


42.     Plaintiff believes Intel has violated Section 2 of the Sherman Act by maintaining a monopoly with the use; the making; the offering for sale; and the sale of Plaintiff's patented new, useful, and improved upon CMDC devices of a laptop, a desktop (PC), and a central processing unit.

## INTEL'S SINGLE-FIRM CONDUCT UNDER SECTION 2 OF THE SHERMAN ACT

43.     Plaintiff believes Intel willfully maintained its monopoly power for present and future generations in the [CPU] market with the unauthorized "use" of Plaintiff's patented

CMDC devices (e.g., laptops; desktop PCs), and Plaintiff's patented CPUs designed and made for Plaintiff's patented CMDC devices.

44.     Intel's customers in the CPU product market are OEMs, alias original equipment manufacturers, alias laptop and computer makers. OEMs compete with each other in various downstream markets, such as the laptop or desktop personal computer (or PC), which for present purposes we can assume to be substantially competitive.

45.     In order to produce a valuable end-product for consumers, these OEMs must produce software and machines that integrate with the CPU technology that they buy. In order to enable OEMs to do so in a sufficiently timely manner to be able to compete effectively in the fast-evolving laptop and computer market, and in order to facilitate simultaneous roll-out of new CPU technology by multiple OEMs and thus maximize the value of advertising expenditure at launch, it was Intel's general practice to supply at least major, or "strategic," OEMs with advance technical information and prototype CPUs on a rolling basis.

46.     It did so, however, under contracts that were terminable at will and authorized use of the technical information only for purposes of building Intel-compatible computers.

47.     The FTC's legal argument was a classic Section 2 Sherman Act argument: Intel, a monopolist, had "willfully maintained its monopoly power in the [CPU] market through exclusionary conduct that was not reasonably necessary to serve any legitimate, procompetitive purpose," with the "specific intent to monopolize both the current generation and future generations of [CPUs]," and with a "dangerous probability" of success in doing so. See *In re Intel Corp.*, No. 9288, Complaint (FTC June 8, 1998): </os/1998/06/intelfin.cmp.htm>; Agreement Containing Consent Order (FTC March 17, 1999): </os/1999/9903/d09288 intelagreement.htm>.

48.     Plaintiff believes, Intel is in violation of Section 2 of the Act, 15 U.S.C. 2; which prohibits monopolization, attempts to monopolize, and conspiracies to monopolize "any part of trade or commerce among the several States or with foreign nations." Intel is considered a monopoly because they are the largest chip manufacture and have made deals with computer manufacturers to produce [plaintiff's patented laptops and desktop PCs] computers with only Intel [alleged infringing CPU] chips.

49.     OEMs must produce laptops and desktop PCs that integrate with the CPU technology that they buy. Plaintiff has alleged Intel's '*advanced technical information*' supplied to the OEMs, is the intellectual property of the Plaintiff.

50.     The Clayton Act authorizes Plaintiff to sue for triple damages when Plaintiff have been harmed by conduct that violates either the Sherman or Clayton Act and to obtain a court order prohibiting the anticompetitive practice in the future.

## THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS RULES THAT PATENT INFRINGEMENT CAN VIOLATE ANTITRUST LAWS

51.     According the U.S. District Court for the Eastern District of Texas, patent infringement can be considered anticompetitive conduct under federal antitrust law.

52.     This ruling arose out of a dispute between Retractable Technologies, Inc. (Retractable) and Becton, Dickinson and Company (BD), *Retractable Technologies, Inc., et al. v. Becton, Dickinson and Co.*, Case No. 2:08-CV-00016 (E.D. Tex.), in which Retractable alleges that BD's infringement of Retractable's patents foreclosed competition and maintained BD's monopoly power in the hypodermic syringe market, thereby violating Section 2 of the Sherman Act, 15 U.S.C. § 2.

COMPLAINT

53.     Intel is the leading U.S. manufacturer of central processing units (CPUs) and holds a very large share of the relevant market.  Plaintiff claims Intel took steps to protect its dominant position after Plaintiff provided Intel with the intellectual property subject matter of Plaintiff's patented inventions in 2010.

54.     Plaintiff contends that Intel's actions of using, making, offering for sale, and selling Plaintiff's patented inventions, together with other exclusionary conduct including unlawful bundling and loyalty discounts, impeded the adoption of Plaintiff's new, improved upon, and useful CMDC devices (i.e., laptops, desktop PCs), and central processing units (CPUs).

55.     Plaintiff believes he has alleged enough factual information, that if taken as true, proves Intel has violated Section 2 of the Sherman Act. Plaintiff believes he has demonstrated that Intel (1) possesses monopoly power, and (2) acquired, enhanced, or maintained that power by exclusionary or anticompetitive conduct, *United States v. Grinnell Corp.*, 384 U.S. 563 (1966).

56.     On September 9, 2013, U.S. District Court Judge Leonard Davis adopted the recommendations of U.S. Magistrate Judge Roy S. Payne's August 5 'Report and Recommendation'.  Judge Davis agreed with Judge Payne that the only binding precedent offered by BD in support of its arguments held that patent infringement is not an injury recognized under the Sherman Act, [a plaintiff must prove antitrust injury in order to recover damages] but this has nothing to do with patent infringement as anticompetitive conduct.

57.     Both judges noted the U.S. Supreme Court's statement in *U.S. v. American Tobacco Co.* that the Sherman Act covers "every conceivable act which could possibly come

within the spirit or purpose of the prohibitions of the law, without regard to the garb in which such acts were clothed", 221 U.S. 106, 181 (1911).

## INTEL HAS ENGAGED IN ANTICOMPETITIVE CONDUCT THAT IS LINKED TO THE ANTITRUST INJURY

58.     Plaintiff is providing data to support 'upon information and belief' Intel's market share is within Intel's possession. Plaintiff does not simply plead that Intel has control [monopoly control] of the market; Plaintiff specifies the percentage of the market control:

59.     Intel's share in laptops grew to 1.2 points to 81 percent against AMD while its desktop share grew 0.8 points to 80.7 percent, according to Mercury Research's report for the fourth quarter of 2020. The result is that Intel grew market share for x86 CPUs overall by 0.7 points, bringing it to 78.3 percent. https://www.crn.com/news/components-peripherals/intel-regains-pc-market-share-against-amd-as-cpu-capacity-expands

60.     Intel and AMD PC Notebook market share: As of Q4 2021, Intel mobile CPU units accounted for 77.8% market share whereas AMD's mobile units held a share of 22.2%. https://wccftech.com/intel-regain-significant-market-share-versus-amd-in-client-pc-segment-thanks-to-alder-lake-epyc-knockout-xeon-server-segment/

61.     In the second quarter of 2022, 63.55 percent of x86 computer processor or CPU tests recorded were from Intel processors, up from the lower percentage share seen in previous quarters of 2021, while 36.4 percent were AMD processors. When looking solely at laptop CPUs, Intel is the clear winner, accounting for 73.7 percent of laptop CPU test benchmark results in the second quarter of 2022. https://www.statista.com/statistics/735904/worldwide-x86-intel-amd-market-share/

Overall x86 CPU Share - ALL CPUs

| Overall x86 CPU Share Includes IoT and SoC | 2021 Q4 Share | 2021 Q3 Share | 2020 Q4 Share | Change Quarter | Change Year |
|---|---|---|---|---|---|
| Intel | 74.4% | 75.4% | 78.3% | - 1.0 | - 3.9 |
| AMD | 25.6% | 24.6% | 21.7% | + 1.0 | + 3.9 |
| VIA | 0.0% | 0.0% | 0.0% | - 0.0 | - 0.0 |
| Total | 100.0% | 100.0% | 100% | | |

62.    Plaintiff has properly alleged the specific product market - namely, laptops, desktop PCs, and central processing units (CPUs). Further, Plaintiff has properly defined the geographic market by pleading it encompasses the United States. "Intel has directed the design and used the OEMs laptops and desktop PCs; and, sold and/or offered for sale in the United States, the central processing units (CPUs) of Intel.

63.    Plaintiff has sufficiently articulated he has suffered an injury as a result of Intel's alleged conduct that has affected the competitive process of marketing Plaintiff's new, useful, and improved upon laptops, desktop PCs, and CPUs.

64.    Plaintiff has properly pleaded its antitrust claims by alleging sufficient facts to support the plausibility of the necessary elements of those claims.

65.    This Court should recognize that "[b]ecause of the innovation and commercial viability that they encourage, courts have afforded suits to enforce patents a presumption of good faith," and that "[i]t naturally follows that a higher standard of proof is needed to overcome that presumption." *Campbell*, 2020 WL 5049051, at *7

66.     The Court of Appeals for the Ninth Circuit has explained, "[t]he road to the Patent Office is so tortuous and patent litigation is usually so complex," that "no less than [c]lear, convincing proof of intentional fraud involving affirmative dishonesty" would suffice in patent cases (citation omitted)).

67.     Intel's, use of, making, offering for sale, and selling of Plaintiff's intellectual property (new, useful, and improved upon laptops, desktop PCs, and CPUs); and, Intel's exclusionary anticompetitive practices made it possible for Intel to maintain its monopoly.

## INTEL'S INVASION ON PLAINTIFF'S INTELLECTUAL PROPERTY SUBJECT MATTER IS TOO EXPANSIVE TO BE COINCIDENTAL

68.     The issue with "intent" is; "did Intel know it was doing something wrong?" Plaintiff believes the antitrust violations alleged in this case are too massive to be unintentional.

69.     The legal standards in antitrust law are generally viewed as combinations of conduct and intent standards. Intel's intent is general when Intel simply engaged in conduct that violates the law. Plaintiff alleges Intel's antitrust violations are more specific because Intel engaged in the anticompetitive conduct for particular reasons (e.g., to harm the Plaintiff, competitors, investors, consumers, the SEC, and the USPTO), or with particular knowledge (e.g., Intel was given notice of Plaintiff's intellectual property in 2010 **(Exhibit A)**.

70.     Case law suggests that Plaintiff must meet a higher burden with respect to Intel's intent under Section 2 of the Sherman Act than is typically required under Section 1. Under Section 1, Plaintiff generally must demonstrate only that the Intel intended to engage in the conduct that is asserted to violate the law. Under Section 2, Plaintiff must [and have] produce

evidence that is consistent with a specific intent to monopolize, in the sense that the overwhelming—perhaps the sole—purpose of the Intel's conduct is to reduce competition.

71.     The best-known conduct standard in antitrust law is the rule of reason (or reasonableness) test, which requires proof that the competitive harms from the Intel's conduct outweigh any purported benefits to consumers from that conduct. Plaintiff believes the consumers and customers were drawn into a scheme of deceit (e.g., consumers reliance upon false information to cover inflated prices), and fraud (e.g., simply not telling the whole story to the OEMs in order to make a deal happen).

72.     The second type of legal standard, an intent standard, determines liability in part by evidence concerning Intel's state of mind. Plaintiff's claims require proof merely of Intel's intent to carry out the conduct set forth in the complaint; these claims fall under a general intent standard. These claims require only that Intel knew that it was taking a particular action, not that Intel does so with the purpose of bringing about a particular (undesirable) result.

73.     Plaintiff believes Intel's invasion on Plaintiff's intellectual property subject matter is too expansive to be coincidental.

74.     Plaintiff believes Intel produced Plaintiff's patented CPUs as prototypes for the OEMs to test with the laptops and desktop PCs. Plaintiff believes the OEMs design Plaintiff's patented laptops and desktop PCs to function with the CPUs provided them by Intel.

75.     Intel was able to form and maintain its monopoly status by using, making, offering for sale, and selling Plaintiff's patented inventions. Intel's anticompetitive conduct is in violation of Section 2 of the Sherman Act. Intel continues its intentional massive invasion of Plaintiff's patented inventions. Plaintiff believes Intel's conduct is not coincidental. See the following:

**Intel's Loihi Neuromorphic Chip for the Detection of Chemical Agents, Biological Agents, Explosives'; Disease and Narcotics**

Intel's Loihi Neuromorphic Chip to Learn and Recognize the Scents of 10 Hazardous Chemicals. Below: Intel Labs' Nabil Imam holds a Loihi neuromorphic chip in his Santa Clara, California, neuromorphic computing lab. (Walden Kirsch/Intel Corp.)



Neural algorithm derived from the architecture of the brain's olfactory circuits, Intel and Cornell trained Intel's Loihi neuromorphic chip to learn and recognize the scents of 10 hazardous chemicals … the activity of 72 chemical sensors in response to these smells and configured the circuit diagram of biological olfaction on Loihi. The chip quickly learned the neural representation of each of the smells and each odor, demonstrating a promising future for neuroscience and AI.



Above: A photo shows Intel's Loihi 2 neuromorphic chip on the tip of a finger

**Plaintiff's Detection System**

**Claim 4 of the '287 patent.**   A communication device comprising:
>   at least one central processing unit (CPU);
>   at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents …
>   at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor … or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

*Specifications*: "[T]he detectors 46 are interconnected to the cpu 40 of the detection system … transmitting the appropriate signals to the cpu 40 upon detection of the particular agent or compound … "a conventional microprocessor for controlling the various functions and generating the appropriate signals for transmission to the cpu 40 of the detector … FIG. 11 illustrates a representative schematic 74 for describing the signal transmission process from the detector 46 to the cpu 40 … chemical, biological, and radiological hazard detections …"

*Intel embedded processor*: The hazardous odors learned and recognized by Loihi pose a danger to public health, serving as precursors in the manufacturing of explosives, narcotics and polymers. The findings demonstrate the promise of neuromorphic chips to recognize these odors under real-world conditions more effectively than conventional solutions and give us a view into potential use cases of neuromorphic technology. Portable "electronic nose systems" with neuromorphic chips could be used by doctors to diagnose diseases, by airport security to detect weapons and explosives, by police and border control to more easily find and seize narcotics, and even to create more effective at-home smoke and carbon monoxide detectors.

**Intel's Mobileye CPUs are Capable of Processing the Operational and Functional Instructions for Driverless & Autonomous Vehicles**

| Intel's Mobileye | Plaintiff's Stall, Stop, Vehicle Slow-down System |
|---|---|
| Mobileye launched 1st generation EyeQ1 processor in 2008. The technology offered driver assistance including AEB (automatic emergency braking). In 2017, Mobileye unveiled model for safe self-driving cars. Mobileye demonstrated an autonomous car equipped only with cameras on the streets of New York City in January 2020. Mobileye Supervision uses EyeQ5 SoC devices processing data from 11 cameras. Mobileye Level 4 self-driving system full sensor suite includes 13 cameras, 3 long-range LiDARs, 6 short-range LiDARs and 6 radars.  In 2021, Intel took Mobileye automotive unit via an IPO of newly issued stock in 2022. Mobileye's vision-based advance driver assistance system (ADAS) is based on the same core technology… systems offer lane departure warning, forward collision warning, headway monitoring and warning  Intel's Mobileye unit unveiled a supercomputer on a chip for autonomous driving at CES 2022. Called EyeQ Ultra, it features 176 trillion operations per second. The SoC provides four proprietary accelerators that are paired with CPU cores. | **Claim 44 of the '891 patent**.  A vehicles' stall-to-stop system or vehicle slowdown system in signal communication with a pre-programmed automated system is adapted, modified, or designed to control the vehicles' stall-to-stop means or vehicle slowdown means, comprising:  an electrical system in electrical communication with at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor;  a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system…  a receiver in electrical communication with the electrical system and adapted to receive at least one control signal …  a receiver in computer communication with the computer system and adapted to receive at least one control signal in response to one of the vehicle's operating … and,  wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the radar, the navigational system, the light, the speed control, …  ***Specifications***: "[a]n electronic device such as a laptop computer … for transmitting signals to a vehicle for activating an onboard stall-to-stop device for bringing the vehicle to a halt … the integration of … electronic communication or telecommunication devices such as … a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188 … the … CPU of the vehicle 192 to initiate or execute any commands that will actuate the stall-to-stop … the CPU … to execute any commands to the stall-to-stop system for executing the disengagement of the vehicle's 192 electromotive system 194 for bringing the vehicle 192 to a halt" |

**Intel's Mobileye 'Supercomputer on a Chip' is Used with Plaintiff's Stall, Stop, Vehicle Slow-down System for Driverless & Autonomous Vehicles**

| | |
|---|---|
|  | **Claim 47 of the RE43,891 patent:** Unintended Acceleration<br><br>**Claim 48 of the RE43,891 patent:** Forward Pre-crash<br><br>**Claim 49 of the RE43,891 patent:** Reverse Pre-crash<br><br>**Claim 50 of the RE43,891 patent:** Vehicle Stabilization<br><br>**Claim 51 of the RE43,891 patent:** Lane Departure<br><br>**Claim 53 of the RE43,891 patent:** Adapted Cruise Control |
|  | **Claim 55 of the RE43,891 patent:** "The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle designed to perform as a driverless or autonomous vehicle for stopping or slowing a vehicle that is in operation with or without a user, driver or operator inside the vehicle." |
|  | **Claim 45 of the RE43,891 patent:** "The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a global positioning system (GPS) receiver adapted for communication with … one satellite."<br><br>**Claim 1 of the 8,334,761 patent:** A vehicle adapted for receipt of a signal from a remote location to remotely control the vehicles' stall-to-stop means or vehicle slowdown means … a user determines that the vehicle has been stolen and in response initiates a distress signal communication … includes … a cell phone tower and a satellite. |
|  | **Claim 46 of the RE43,891 patent:** "The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a cellular communication device adapted for communication with at least one cell phone tower; further including, at least one satellite connection capable of communicating with the pre-programmed automated system; further including, … one modem connection for short and long range radio frequency … to and from the pre-programmed automated system." |
|  | **Claim 52 of the RE43,891 patent:** "The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a remote vehicle slowdown system for stopping or slowing a vehicle by remote means." |

**Intel's CPUs are Capable of Processing the Operational and Functional Instructions of the Intel-based Laptops Equipped with Fingerprint Scanners**

| | |
|---|---|
| <br><br>HP Envy 13: Integrated UHD Graphics; Intel Core i7-1165G7; 13.3-inch FHD; Touchscreen Display; Fingerprint Scanner<br><br><br><br>Dell Vostro 15 5000 5510; Intel Iris Xe Graphics; 11th Generation Intel Core i7-11370H; 15.6-inch FHD (1920 x 1080); Anti-glare Display; Fingerprint Scanner<br><br><br><br>Lenovo IdeaPad 5; Intel Iris Xe Graphics; 11th Gen Intel Core i5-1135G7; 15.6" FHD WVA 300nits Anti-glare, 10-point Multi-touch Display; Fingerprint Scanner | **Plaintiff's Biometric Fingerprint**<br><br>**Claim 1 of the '189 patent.** A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising …<br>    at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program …<br>    wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal …<br><br>***Specifications:*** "[t]he fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock … [a] match occurs with a known fingerprint stored by the cpu … [p]roduct grouping 6 (biometrics) include, but are not limited to, fingerprint recognition"<br><br>***Defined:*** Biometrics is a technology that uses a human's biological features, such as facial charac-teristics, fingerprint patterns, retina, voice and signature, to authenticate a person's identification and authorize specific actions. Of all of them, fingerprint analysis technology is the most mature and has the widest acceptance. Fingerprint biometrics: is legal representation of a person's signature<br><br>When a finger is detected, the auto-finger detection circuit sends an interrupt signal to the host CPU, which wakes the sensor for the finger scan. Once the scan is complete, the CPU tells the sensor to return to sleep mode. The memory holds the image data until the CPU is available. The data is synchronized with the CPU for processing… |

**Intel's CPUs are Capable of Processing the Operational and Functional Instructions of the Intel-based Laptops Enabled Near-Field Communication (NFC) Standards**

| | |
|---|---|
| Dell systems (laptops; desktop PCs) that incorporate Intel's CPUs and NFC will include this symbol<br><br><br><br>Ultrabooks and other Intel-based laptops. The companies will bring MasterCard's NFC-powered PayPass to Ultrabooks and other Intel-based laptops. On compatible systems you'll only need to tap your PayPass-enabled credit card or device to your computer — there'll be no need to type out the card number, pesky three-digit code, or expiration date.<br><br> | **Plaintiff's Near-Field Communication**<br><br>**Claim 22 of the '439 patent**.     A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal, comprising<br>            at least one of a central processing unit (CPU), a network processor, or a front-end processor for communication between a host computer and other devices …<br>            the communication device being capable of wireless near-field communication (NFC) which allows radio frequency (RF) data to be at least one of received or transferred between the communication device and at least one tag that is read by the communication device;<br><br>***Specifications***: "[r]adio frequency (i.e., near-field communication (NFC)) interconnected to a central processing unit (cpu), such as cpu 40 … "[p]roduct grouping 5 (communication methods) include, but are not limited to… Radio Frequency"<br><br>***Defined***: Near Field Communication (NFC) is a set of standards for laptops and similar devices to establish radio communication with each other by touching them together, or bringing them in close proximity with each other, usually no more than a few inches/centimeters.<br><br>***Intel embedded processor***: Intel says that with its Identity Protection Technology there's no need to worry. IPT features both hardware and software authentication: after you type in a username and password, an embedded processor will generate a one-time authentication code, and then hand off the (encrypted) info. By Dante D'Orazio, Nov 14, 2011, 12:31pm EST<br><br>***Example***: Dell - Latitude 9000 15" Laptop; Processor Brand – Intel; Processor Model - Intel 11th Generation Core i7; Intel Core i7 - 16 GB Memory - 512 GB SSD; Operating System - Windows 10 Pro; NFC Enabled $2,569.99 |

**Intel's CPUs are Capable of Processing the Operational and Functional Instructions of "Intel's Vision" Internet of Things**

| | |
|---|---|
| "The Internet of Things (IoT) offers tremendous new business opportunities. By leveraging the Intel® family of processors, organizations can integrate ..." https://www.intel.com. "At Intel, we understand the exponential power of data, and we're making it practical and economical to put it to work from edge to cloud. By enabling technology providers to develop solutions that harness the massive flood of data through the combination of IoT, AI, and 5G, we'll accelerate business transformation to a degree never before seen." <br><br> | **Plaintiff's Internet of Things (IoTs)** <br><br>**Claim 11 of the '619 patent.**    A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of ... <br>        processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission; <br>        processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and ... |
| "[E]nhanced for IoT, Intel Atom® x6000E processor series and Intel® Pentium® and Celeron® N and J Series processors deliver next-generation CPU [] performance with integrated support for real-time computing ... [u]p to 70 percent of enterprises will run varying levels of data processing at the IoT edge by 2023 ... [T]o support the next generation of IoT edge devices, Intel has developed a new line of processors enhanced for IoT: The Intel Atom® x6000E processor series and Intel® Pentium® and Intel® Celeron® N and J Series processors. These processors build on new levels of CPU and graphics performance with integrated IoT features, real-time performance, manageability, security, and functional safety." https://www.intel.com/ | ***Specifications***: "[I]nternet and GPS connections and a cpu interconnected with the Internet and GPS connections ... the present invention illustrating the GPS, Internet and power source connections ... connections or contacts that can include an Internet connection 32, a GPS connection ... [p]roduct grouping 5 (communication methods) include, but are not limited to ... Internet ... Global Positioning System (GPS)" <br><br>***Defined***: 12th Gen Intel® Core™ Processors for IoT Applications: These IoT processors combine Performance-cores (P-cores) to enhance single-thread throughput for IoT workloads and Efficient-cores (E-cores) to enhance task management and multithread throughput. Intel® Xeon® D-1700 and D-2700 Processors for IoT Applications: These processors are ideal for video analytics, workload consolidation, and other demanding applications for video analytics, manufacturing, aerospace, and defense. <br><br>***Intel IoT and GPS***: When paired with IoT, GPS provides the ability to quantify and record large amounts of data pertaining to time, location, speed and direction. IoT technology enhances GPS devices to transmit data remotely and connect to other systems and sensors. GPS and IoT are complementary to create a more robust, accessible collection of interconnected data. |

## INTEL WILLFULLY CONTRIBUTED TO THE INFRINGEMENT OF PLAINTIFF'S CPUs; CMDC DEVICES; STALL, STOP, & VEHICLE SLOWDOWN SYSTEMS

76.     Liability for contributory infringement [1] of a patent is defined by 35 U.S.C. § 271(c): "Whoever offers to sell or sells within the United States … a material or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, … shall be liable as a contributory infringer."

77.     The threshold requirement for this claim of contributory infringement is the existence of direct infringement. *See Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518 (1972).  Plaintiff has shown throughout this complaint "that the alleged contributory infringer knew of the patent and that his or her [Intel's] actions would lead to infringement of the patent. *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476 (1964).

78.     Intel was knowledgeable of Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices. Plaintiff provided Intel with 'notice letters' in December, 2010.

---

[1] Contributory infringement originated in case law as a way to enable a patentee to enforce a patent when it was being infringed by a large number of persons whom it was impractical to sue together. The doctrine of contributory infringement permitted the patentee to sue an entity that had instigated the collective infringement either by selling a product that had no use other than to infringe the patent, or using other means to encourage infringement, such as providing instructions on how to infringe the patent. Liability for contributory infringement of a patent is defined by 35 U.S.C. § 271(c): "Whoever offers to sell or sells within the United States … a material or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, … shall be liable as a contributory infringer."

79.    Contributory infringement – otherwise known as 'indirect infringement' or 'infringement by supply' includes Intel's actions of supplying the OEMs with Plaintiff's patented CPUs, that contribute (or potentially contribute) to the OEMs infringing Plaintiff's patented laptops and desktop PCs; even if those actions do not directly infringe the patent.

80.    Upon information and belief, Intel has continued to make, offer for sale, and sell Plaintiff's central processing units (CPUs); and, has continued to use Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices i.e., new and improved laptops and desktop PCs, to generate profits, without a license or authorization to do so.

81.    Plaintiff's "anticompetitive" clams involving intellectual property are brought under Section 1 and Section 2 of the Sherman Act, Section 3 of the Clayton Act, and Section 5 of the Federal Trade Commission (FTC) Act.

82.    The CPU is the Central Processing Unit which is responsible for carrying out the instructions of a computer program [operating systems (android), contain and manage all the programs and applications that a computer is able to run, which means managing the device's software and hardware functions], by performing the basic arithmetical, logical, and input/output operations of the system.

83.    After the doctrine of contributory infringement developed in the courts, Intel found ways to use it to extend their patent monopolies beyond the scope of their patents. This was accomplished primarily through contributing to the alleged infringing products of the OEMs.

84.    In *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337 (Fed. Cir. 2018), the Federal Circuit expressly stated: "'the Federal Rules of Civil Procedure do not require a plaintiff to plead

facts establishing that each element of an asserted claim is met.'" *Id. at 1350* (quoting *In re Bill of Lading,* 681 F.3d 1323, 1339 (Fed. Cir. 2012) (emphasis added). *Nalco* appears to hold that element-by-element allegations are unnecessary.

85.     In my e-mail correspondence with Intel on June 16, Plaintiff offered Intel a reasonable settlement **(Exhibit I)**: "I offered you a licensing agreement to ensure you received something in exchange for accepting my offer. The amount I quoted you does not include the potential liability Intel could face for unjustly enriching itself to the tune of hundreds of billions of dollars for <u>using</u> my patented CMDC devices (i.e., laptops; desktop PCs. etc.); and, for offering for sale, and selling my patented CPUs designed for use with my CMDC devices; and, for illegally forming a monopoly with my intellectual property, after receiving [my] first notice in December, 2010." A copy of the related complaint against Qualcomm was attached to the e-mail and is included with this complaint as **(Exhibit J)**

86.     In the e-mail Plaintiff informed Intel that according to Statista, "Intel's net revenue from 2011 to 2021 is $693.07B." https://www.statista.com/statistics/263559/intels-net-revenue-since-1999/ Plaintiff included the stats to demonstrate that the $1B Plaintiff was willing to settle for is estimated at 1/7 of 1% of Intel's net revenue from 2011 to 2021 is $693.07B. Less than ½ of a penny on the dollar.

87.     In the e-mail Plaintiff also informed Intel of a potential damage estimate. "If I am only awarded $10B in damages. That's 10 times more than the $1B I am asking for. If the damages are triple ($30B), that's 30 times more than what I am asking for. The only reason something like this could happen, is Intel's pride won't allow them to negotiate in good faith with someone like me."

88.     The Clayton Act authorizes Plaintiff to sue for triple damages when Plaintiff have

been harmed or injured by conduct that violates either the Sherman or Clayton Act and to obtain

a court order prohibiting the anticompetitive practice in the future.

## SUMMARY

| (Exhibit A): Dec. 2010 "Notice" Letter Disclosures | Illustrative Charts | Patent Claims | Written Support - Patent Specifications |
|---|---|---|---|
| Laptops / Desktops | Laptops / Desktops Pgs. 9, 26 of Complaint | Claim(s) 13 of the "439 Patent | Yes |
| CPU | CPU Pgs. 10, 20, 26-28 of Complaint | Claim(s) 5 of the "287 Patent | Yes |
| Stall, Stop, Vehicle Slowdown | Mobileye - ADAS Pgs. 24-25 of Complaint | Claim(s) 44-53, 55 of the "891 Patent | Yes |
| Detection Systems | Detection of 10 hazardous chemicals Pg. 23 of Complaint | Claim(s) 4 of the "287 Patent | Yes |
| Biometric Fingerprint | Biometric Fingerprint Scanners Pg. 26 of Complaint | Claim(s) 1 of the "189 Patent | Yes |
| Radio Frequency Connection | Radio Frequency Near-Field Communication Pg. 27 of Complaint | Claim(s) 22 of the "439 Patent | Yes |
| Internet Connection | Internet of Things (IoTs) Pg. 28 of Complaint | Claim(s) 11 of the "619 Patent | Yes |

COMPLAINT

## **RELIEF**

A. Temporary injunctive relief for Intel to discontinue the making, offering for sale, and selling of its central processing units (CPUs) for laptops, desktop PCs, and Advanced Driver Assistance Systems (ADAS) for autonomous and driverless vehicles

B. Temporary injunctive relief for Intel to discontinue the use Plaintiff's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e., new and improved laptops and desktop PCs) that are currently being used, without authorization, by Intel to generate revenues.

C. Summary judgement on the merits of the case for willful infringement; direct infringement; induced infringement; contributory infringement; divided infringement; and, infringement under the *doctrine of equivalents.*

D. Damages found or assessed for willful infringement; direct infringement; induced infringement; contributory infringement; divided infringement; and, infringement under the *doctrine of equivalents.*

E. Damages up to three times the amount found or assessed for willful contributory infringement.

F. Summary judgement on the merits of the case for Intel's single-firm anticompetitive conduct (under section 2 of the Sherman Act), and unjust enrichment.

G. Damages found or assessed for Intel's single-firm anticompetitive conduct (under Section 2 of the Sherman Act), that has cause Antitrust injury to the Plaintiff, and that harms the competitive process and thereby harms consumers.

H. Trible damages for the Antitrust injury imposed by Intel for violating Federal Antitrust Laws (Section 4 of the Clayton Act, 15 U.S.C.S. § 15, provides that "any person who

shall be injured in his business or property by reason of anything forbidden in the

antitrust laws may sue" for treble damages, prejudgment interest, and costs of suit,

including attorney fees.

I.   The Court orders Intel to establish, at minimum, a $20 billion dollar reserve with the SEC

for "Probability of the Incurrence of a Loss". The reserve is returned to Intel if found not

liable.


Intel has announced that it plans to acquire the autonomous car hardware firm Mobileye for a

cool $15 billion. Intel's $15 Billion Mobileye Buyout Puts It in the Autonomous Car Driver's

Seat https://www.technologyreview.com/2017/03/13/106275/intels-15-billion-mobileye-buyout-

puts-it-in-the-autonomous-car-drivers-seat/


[T]his is where Intel, the American company that helped build Silicon Valley, is going to build

its $20 billion semiconductor mega site. Intel's CEO, Pat Gelsinger, who is here tonight, told me

they are ready to increase their investment from $20 billion to $100 billion. *Remarks of President*

*Joe Biden – State of the Union Address as Prepared for Delivery. MARCH 01, 2022*

COMPLAINT

Sincerely,

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

# SERVICE OF PROCESS

Intel Corporation

2200 Mission College Blvd,

Santa Clara, CA 95054