# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA (SAN JOSE)

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

FILED

SEP 01 2022

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
SAN JOSE OFFICE

|  |  |
|---|---|
| LARRY GOLDEN | CASE NO: <u>5:22-cv-03828-NC</u> |
| *Pro Se* Plaintiff, | **(JURY TRIAL DEMANDED)** |
| V. | **(Sherman Act) (The Clayton Act) (Unjust Enrichment) (Contributory Infringement).** |
| INTEL CORPORATION. | |
| Defendant. | August 9, 2022 |

## PLAINTIFF'S RESPONSE TO INTEL'S MOTION TO DISMISS AND CROSS MOTION FOR SUMMARY JUDGEMENT

This is a civil action brought under Antitrust Law violations commencing from competitor collaborations, conspiracy to restrain trade, and the illegal formation or maintenance of a monopoly, which likely resulted from secret conspiracies that involve exclusive agreements and the anticompetitive practices that "unjustly enriched" Intel; recognized by this Court.

## <u>INTEL'S BUSINESS MODEL IS BASED ON VIOLATING ANTITRUST LAWS TO MAINTAIN A MONOPOLY; AND, UNJUSTLY ENRICH ITSELF</u>

Patent owners have the "Exclusive Right" to make and use their inventions. See U.S. Const. art. I, § 8; 35 U.S.C. § 271. For hundreds of years, inventors have benefited from this exclusivity directly, for example, by selling products, and indirectly, for example, by licensing their inventions to others so that they can sell products instead. *See generally* B. Zorina Khan, *Trolls and Other Patent Inventions: Economic History and the Patent Controversy in the Twenty-First Century*, 21 Geo. Mason L. Rev. 825, 831 (2014).

The ability to pursue either path is an important part of the U.S. patent system in which inventors obtain the benefit of a limited period of exclusivity in exchange for making their idea publicly available going forward. *See* Adam Mossoff, *Who Cares What Thomas Jefferson Thought About Patents? Reevaluating the Patent "Privilege" in Historical Context*, 92 Cornell L. Rev. 953, 962 (2007).

The possibility of licensing or even selling a patent is not only an important tool for inventors, it is also an important driver of innovation. In particular, it allows inventors to focus on developing new ideas rather than attempting to be "marketers, producers, and commercializers of patented discoveries." See Khan, *Trolls and Other Patent Inventions: Economic History and the Patent Controversy in the Twenty-First Century*, 21 Geo. Mason L. Rev. at 833.

Intel actually reduced competition when they 'rush to market' to "use" the new and improved laptops and tablets that allegedly infringe Plaintiff's patented CMDC devices; and, to make, offer to sell, and sell CPUs that allegedly infringe Plaintiff's patented CPUs, after obtaining knowledge in 2010, of Plaintiff's intellectual property subject matter. (Attached as **Exhibit A** to this document; and, attached in this Case 5:22-cv-03828-NC, at Dkt. 1-7; filed 06/28/22)

When Intel massively made, used, offered for sell, and begin marketing and selling products that allegedly infringes Plaintiff's patented inventions without a license; the anticompetitive conduct drastically reduced incentives for Intel's competitors to enter into licensing agreements with the Plaintiff, and thereby substantially harmed competition.

**Plaintiff is Alleging, Intel is Engaging in a "Systematic Campaign" of Illegal Conduct to Protect Its Monopoly; and, Plaintiff's "Alleged Injuries Flow from the Alleged Harm to Competition.**

Intel's history of antitrust investigators and lawsuits is retrieved from: *Intel and antitrust: A brief history. FTC complaint against Intel latest in long list of events*: By Network World staff and IDG News Service; Network World | DEC 16, 2009 12:00 AM PST

"The Federal Trade Commission's antitrust lawsuit against Intel marks the latest development in one of several antitrust cases that have dogged the world's largest chip maker for years. Here's a rundown of Intel's brushes with antitrust investigators and lawsuits around the world since 1990:

**1990**

Dec. 19: Microprocessor maker Cyrix filed an antitrust lawsuit against Intel in the U.S. District Court of the Northern District of Texas. "Intel has engaged in a campaign of unlawful exclusionary practices to protect its coprocessor monopoly from competition by Cyrix," the company said in a statement.

**1991**

June 29: The U.S. Federal Trade Commission (FTC) informed Intel that it was investigating the company's business practices.

Aug. 20: Advanced Micro Devices brought a $2 billion antitrust lawsuit against Intel in the U.S. District Court of the Northern District of California, alleging that Intel "engaged in unlawful acts designed to secure and maintain a monopoly."

Dec. 19: U.S. District Court Judge James Ware dismissed part of AMD's antitrust lawsuit against Intel because a four-year statute of limitations had passed for some actions listed in AMD's complaint. AMD declared its intention to press forward with the lawsuit anyway.

May 28: Processor maker Chips and Technologies sued Intel for antitrust violations in the U.S. District Court of the Northern District of California. The claims were a response to a February 1992 patent lawsuit filed by Intel.

**1993**

Feb. 4: Chips and Technologies agreed to dismiss its 1992 antitrust claims against Intel as part of a settlement to resolve a patent dispute between the two companies.

July 15: The FTC completed its investigation into Intel's business practices, saying no evidence was found to support charges of anticompetitive behavior.

**1994**

Feb. 4: Cyrix dismissed its 1990 antitrust claims against Intel as part of a patent-dispute settlement between the two companies.

**1995**

Jan. 11: AMD and Intel announced a broad legal settlement that ended several court cases between the two companies, including the 1991 antitrust lawsuit filed by AMD.

**1997**

Aug. 27: The FTC requested additional information from Intel concerning its plans to acquire Chips and Technologies, citing antitrust laws. At the time, Chips and Technologies was a major supplier of graphics chips.

Sept. 25: The FTC began a second antitrust investigation into Intel's business practices. This investigation was conducted separately from the review of Intel's offer to acquire Chips and Technologies.

**1998**

Jan. 13: The FTC decided not to seek an injunction against Intel's acquisition of Chips and Technologies but announced plans to "continue the investigation into the lawfulness of the acquisition."

April 23: The FTC ruled that an October 1997 legal settlement between Intel and Digital Equipment that included the sale of Digital Equipment's semiconductor division, including its Alpha processor, to Intel would violate U.S. antitrust law if completed. As a result, the FTC required Digital Equipment to offer licenses for its Alpha processor to both AMD and Samsung Electronics as part of the deal.

June 8: The FTC issued an antitrust ruling against Intel. The FTC found that Intel stopped providing important technical information about its products to Digital Equipment, Compaq

Computer and Intergraph after the three companies took legal action against Intel to enforce microprocessor patents they held. Intel also threatened to stop selling microprocessors to those companies, the FTC said.

**1999**

March 17: The FTC accepted a settlement with Intel over the 1998 antitrust ruling. The agreement required Intel to refrain from withholding technical information from customers involved in intellectual-property litigation with the company, but did not constitute an admission of guilt on the chip maker's part.

**2000**

Sept. 26: The FTC ended its second investigation into Intel's business practices and decided to take no further action against the company.

**2004**

April 8: The Fair-Trade Commission of Japan (JFTC) raided the offices of Intel's Japanese subsidiary and several Japanese computer companies as part of an investigation into Intel's business practices.

**2005**

March 8: JFTC ruled that Intel violated Japanese antitrust laws and hurt competition in the country's processor market.

March 31: Intel disputed the JFTC's findings, but did not contest them and agreed to refrain from certain business practices.

June 27: AMD filed an antitrust lawsuit against Intel in the U.S. District Court for the District of Delaware. The lawsuit detailed allegations of anticompetitive behavior by Intel in the United States, Asia and Europe.

June 30: AMD sued Intel in the Tokyo High Court and the Tokyo District Court, seeking more than $50 million in damages arising from the chip maker's anticompetitive actions in Japan.

July 12: European Commission investigators raided the offices of Intel and PC manufacturers in several countries as part of an antitrust investigation.

**2006**

Feb. 9: Korean Fair-Trade Commission (KFTC) officials raided Intel offices in South Korea.

July 17: AMD filed a complaint against Intel with Germany's Federal Cartel Office, claiming that a deal between Intel and retailer Media Markt blocked the sale of computers based on AMD processors at hundreds of retail outlets.

Sept. 11: European Commission antitrust officials announced plans to investigate the complaint filed in Germany by AMD against Intel and Media Markt.

**2007**

July 27: The European Commission charged Intel with antitrust violations. It accused Intel of offering rebates to PC manufacturers that buy the majority of their processors from Intel, paying PC manufacturers to delay or cancel products based on AMD processors, and selling processors below cost when bidding against AMD for contracts with server makers.

Sept. 12: The KFTC issued preliminary antitrust charges against Intel while continuing its investigation into the company's business practices in South Korea.

**2008**

Jan. 10: The New York State Attorney General launched an antitrust investigation of Intel. The chip maker was served with a subpoena seeking information on its pricing practices and "possible attempts to exclude competitors through market domination."

Feb. 12: European Commission investigators raided Intel's office in Munich. The offices of retailers Media Markt and DSG International were also raided by investigators.

June 6: The U.S. Federal Trade Commission served a subpoena to Intel, opening another antitrust investigation into the chip maker. Intel says it will work cooperatively with the FTC to provide information.

July 17: The European Commission leveled another set of antitrust charges against Intel, saying "that Intel has infringed rules on abuse of dominant position with the aim of excluding its main rival AMD from the x86 central processing units' market."

**2009**

May 13: The European Commission finds Intel guilty of antitrust violations in the PC microprocessor market and fines the company $1.44 billion, saying Intel's actions harmed millions of European consumers. The main antitrust abuses involved paying rebates to system manufacturers and to Europe's largest IT retailer, Media Markt, in order to shut out Intel's closest rival, AMD.

July 22: Intel appealed the $1.44 billion fine in a European court.

Nov. 4: New York Attorney General Andrew Cuomo filed a federal antitrust lawsuit against Intel in the U.S. District Court in Delaware, alleging that company engaged in a "systematic campaign" of illegal conduct to protect a monopoly. Cuomo alleged that Intel extracted exclusive agreements from large computer makers and threatened to punish those perceived to be working too closely with Intel competitors.

Nov. 12: Intel and AMD settled all antitrust litigation and patent cross-license disputes the companies had with each other. Intel agreed to pay AMD $1.25 billion, while agreeing to a set of business practice provisions and a five-year cross-licensing agreement. AMD agreed to drop all regulatory complaints and pending legal disputes against Intel, but the settlement does not prevent other organizations from pursuing legal action against Intel.

Dec. 16: U.S. Federal Trade Commission filed antitrust lawsuit against Intel, alleging that Intel has waged a "systematic campaign" to cut off rivals' access to the marketplace and prevent adoption of superior products produced by competitors.

**2010**

On 12/16/2010: Plaintiff's notice letters and licensing offer was mailed U.S. Postal Service, Certified Mail to Mr. Paul S. Otellini, President & CEO Intel, and Mr. Curt J. Nichols, VP Intel Capital Intel, at Mission College Blvd., Santa Clara, CA 95054-1549. Intel received and signed for the letters 12/20/2010. Phone: 408-765-8080. Tracking Nos: 7010 1870 0002 0193 0360 and 7010 1870 0002 0193 0377. (Attached as **Exhibit A** to this document; and, attached in this Case 5:22-cv-03828-NC, at Dkt. 1-7; filed 06/28/22)

**2010 - 2022 (12 years)**

Plaintiff has patiently waited on Intel for twelve years to cease and desist making, using, offering for sell, or selling products that Intel was notified on 12/16/2010 is the intellectual property subject matter that is covered in Plaintiff's patents.

Plaintiff has patiently waited on Intel for ten years [2012-2022] to initiate a challenge to Plaintiff's patents at the PTAB. The procedure for conducting *inter partes review* took effect on Sep. 16, 2012, and applies to any patent issued before, on, or after Sep. 16, 2012. Plaintiff has asserted 45 patent claims of 7 patents in this case that Intel could have challenged at the PTAB:

- Plaintiff's 7,385,497 ('497 patent) issued on 06-10-2008: [ind. claim 1 that covers a threat-detection device that is placed in, on, upon or adjacent the monitoring equipment—CMDC devices of at least a monitoring computer PC; desktop PC; laptop]

- Plaintiff's 8,106,752 ('752 patent) issued on 01-31-2012: [ind. claim 10 that covers a threat-detection device that is placed in, on, upon or adjacent the monitoring equipment—CMDC devices of at least a monitoring computer PC; desktop PC; laptop]

- Plaintiff's RE43,891 ('891 patent) issued on 01-01-2013: [ind. claim 44 and dep. claims 45 - 55 that includes "products grouped together by common features and design similarities"—Stall, Stop, Vehicle Slowdown (SSVS) Systems of at least a pre-crash (SSVS); unintended acceleration (SSVS); driverless and autonomous vehicle (SSVS); brake override (SSVS)]; adjusted cruise control (SSVS); vehicle stabilization (SSVS); lane departure (SSVS); remote (SSVS); pre-programed (SSVS)]

- Plaintiff's 9,096,189 ('189 patent) issued on 08-04-2015: [ind. claims 1 - 9 that includes "products grouped together by common features and design similarities"—CMDC devices of at least a monitoring computer PC; desktop PC; laptop, cell phone; smartphone]

- Plaintiff's 9,589,439 ('439 patent) issued on 03-07-2017: [ind. claims 13 - 23 that includes "products grouped together by common features and design similarities"—CMDC devices of at least a monitoring computer PC; desktop PC; laptop, cell phone; smartphone]

- Plaintiff's 10,163,287 ('287 patent) issued on 12-25-2018: [ind. claims 4 - 6 that includes—CMDC devices of at least a monitoring computer PC; desktop PC; laptop, cell phone; smartphone that comprises a central processing unit (CPU). The CPU is considered the "brains" of the devices and without one the device cannot function]; and,

- Plaintiff's 10,984,619 ('619 patent) issued on 04-20-2021: [ind. claims 1 & dep. claims 2 – 10; ind. claims 11 & dep. claims 12 – 20 that includes—CMDC devices of at least a monitoring computer PC; desktop PC; laptop, cell phone; smartphone that comprises a

central processing unit (CPU). The CPU is considered the "brains" of the devices and without one the device cannot function]

Intel failed to specifically respond to Plaintiff's notice letters and licensing offer; Plaintiff's cease and desist request; and, fail to challenge Plaintiff's patents at the PTAB. Therefore, when Plaintiff states he has the patent rights to exclude Intel from making, using, offering for sell, or selling Plaintiff's patented desktop PCs; laptops, cell phones; or smartphones, it should be taken as fact because Intel had 12 years to dispute Plaintiff's claims, but never did.

## Intel is Engaged in a "Systematic Campaign" of Illegal Conduct to Protect Its Monopoly

The U.S. Federal Trade Commission: "Intel has engaged in a deliberate campaign to hamstring competitive threats to its monopoly," Richard Feinstein, director of the FTC's Bureau of Competition, said in a statement. "It's been running roughshod over the principles of fair play and the laws protecting competition on the merits. The commission's action [] seeks to remedy the damage that Intel has done to competition, ***innovation***, and, [] the American consumer."

According to the information presented in the previous section about Intel's history of being engaged in a "systematic campaign" of illegal conduct to maintain its monopoly, has harmed competition and enabled Intel to unjustly enrich itself.

Defendant wants this Court to believe Plaintiff's claim is *frivolous*. A frivolous claim, often called a bad faith claim, refers to a lawsuit, motion or appeal that is intended to harass, delay or embarrass the opposition. Considering Intel's history, Plaintiff claim has merit.

A claim is frivolous when the claim lacks any arguable basis either in law or in fact *Neitze v. Williams*, 490 U.S. 319, 325 (1989). That means, in a frivolous claim, either: (1) "the 'factual contentions are clearly baseless,' such as when allegations are the product of delusion or fantasy;" or (2) "the claim is 'based on an indisputably meritless legal theory'." *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998).

Plaintiff certifies that to the best of Plaintiff's knowledge, information, and belief, formed after reasonable inquiry, that this complaint against Intel, is not frivolous, and is well-grounded in fact and is warranted by existing law, and that it is not interposed for any improper purpose, such as to harass or to cause frivolous litigation.

# SUMMARY JUDGEMENT FOR CONTRIBUTORY (INDIRECT) PATENT INFRINGEMENT AGAINST INTEL

The threshold requirement for a claim of contributory infringement is the existence of direct infringement. *See Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518 (1972). Plaintiff has Satisfied the Requirement of Direct Infringement Under 28 U.S.C. § 1498(a); and, also Satisfied the Requirement of Direct Infringement Under 35 U.S.C. § 271(a) for Plaintiff's CMDC Device (New and Improved Cell Phoned; Smartphone)

Issued patents are not *frivolous*. "A patent shall be presumed valid." 35 U.S.C. § 282. The courts have interpreted this statutory provision to mean that, in order for a challenger to prove that a patent is invalid for violating one of the provisions of the Patent Act, he must make such proof by the heightened standard of 'clear and convincing' evidence.

The rationale behind this statutory provision is that the PTO is a Federal agency that has already passed on the validity of the claims of issued patents. Patent examiners are presumed to be experts in the subject matter of reviewing patent applications and granting patents. Thus, for the initial Federal review by an expert to have any meaning, a challenger must present evidence that reaches a higher level than merely more likely than not.

**35 U.S.C. § 282(a). In General.** A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., new and improved desktop PC, laptop, tablet, cell phone; or, smartphones) is designed through '*product grouping*' as an '*invention of inventions*' that's presumed valid.

## Contributory Infringement

Intel's liability for contributory infringement of Plaintiff's patent(s) is defined by 35 U.S.C. § 271(c): "Whoever offers to sell or sells within the United States … a material or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, … shall be liable as a contributory infringer."

The threshold requirement for a claim of contributory infringement is the existence of direct infringement.  *See Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518 (1972).  There must also be a showing that the alleged contributory infringer knew of the patent and that his or her actions would lead to infringement of the patent.  *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476 (1964).

Intel was knowledgeable of Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices. Plaintiff is alleging facts that supports Plaintiff's claim that Intel had prior knowledge of Plaintiff's patented CPUs designed for Plaintiff's CMDC [handset] devices."

On 12/16/2010: Plaintiff's notice letters and licensing offer was mailed U.S. Postal Service, Certified Mail to Mr. Paul S. Otellini, President & CEO Intel, and Mr. Curt J. Nichols, VP Intel Capital Intel, at Mission College Blvd., Santa Clara, CA 95054-1549. Intel received and signed for the letters 12/20/2010. Phone: 408-765-8080. Tracking Nos: 7010 1870 0002 0193 0360 and 7010 1870 0002 0193 0377. (Attached as **Exhibit A** to this document; and, attached in this Case 5:22-cv-03828-NC, at Dkt. 1-7; filed 06/28/22)

Intel was given twelve (12) years to produce a patent(s) that invalidates Plaintiff's patents for Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., new and improved desktop PCs; laptops; tablets, etc.) and Plaintiff's Central Processing Units (CPUs). During the same time period Intel had every opportunity to negotiate a licensing agreement with Plaintiff.

The US District for the Eastern Court of Texas in *Motiva Patents, LLC v. HTC Corporation*, E.D. Texas, 9:18-cv-00179 (Oct. 2019), ruled that having a policy of ignoring others' patents is sufficient grounds to support claims of willful patent infringement.

The Eastern District Court found HTC's policy of ignoring others' patents opened the door for support of Motiva's assertions that HTC willfully infringed upon Motiva's patents. The court stated that intentionally being blind to the facts was essentially the same as knowing about a competitor's patent and infringing on it anyway.

The basic principle of "ignorance of the law is no excuse" applies to patent infringement—as the defendant in a Texas patent case discovered.

Contributory infringement – otherwise known as 'indirect infringement' or 'infringement by supply' includes actions that contribute (or potentially contribute) to someone else infringing a patent, even if those actions do not directly infringe the patent.

When Intel imports, sells or offers to sell a component or part [Intel's CPU, Chipset, Processor, or SoC] that's used exclusively for a patented item [Plaintiff's CMDC devices—new and improved desktop PC; laptop; tablet, etc.] or process, is likely contributorily liable. Intel do not have to be involved in the sale, manufacture or use themselves to be liable.

Below, is a list of Intel projects that describes how Intel has duplicated Plaintiff's intellectual property subject matter to "unjustly enrich" itself. The projects are described in greater detail in the Original Complaint (pgs. 23 – 28):

- Intel's Loihi Neuromorphic Chip for the Detection of Chemical Agents, Biological Agents, Explosives'; Disease and Narcotics (pg. 23)
- Intel's Mobileye CPUs are Capable of Processing the Operational and Functional Instructions for Driverless & Autonomous Vehicles (pg. 24)
- Intel's Mobileye 'Supercomputer on a Chip' is Used with Plaintiff's Stall, Stop, Vehicle Slow-down System for Driverless & Autonomous Vehicles (pg. 25)
- Intel's CPUs are Capable of Processing the Operational and Functional Instructions of the Intel-based Laptops Equipped with Fingerprint Scanners (pg. 26)
- Intel's CPUs are Capable of Processing the Operational and Functional Instructions of the Intel-based Laptops Enabled Near-Field Communication (NFC) Standards (pg. 27)
- Intel's CPUs are Capable of Processing the Operational and Functional Instructions of "Intel's Vision" Internet of Things (pg. 28)

Below is a chart illustrating how Intel allegedly "used" the intellectual property subject matter of Plaintiff's *first* patent claim [claim 1] of Plaintiff's *first* patent [the '497 patent filed on 04/05/2006] to "engaged in unlawful acts designed to secure and maintain a monopoly." Again, Intel's invasion of Plaintiff's intellectual property subject matter is too expansive to be coincidental.

| Claim 1 of Plaintiff's '497 Patent | Plaintiff's Central Processing Unit (CPU) | Duplicate Intel Projects |
|---|---|---|
| A multi sensor detection … system for monitoring products and for detecting chemical, biological, and radiological agents and compounds … | … including a … Central Processing Unit (cpu) | Intel's Loihi Neuromorphic Chip for the Detection of Chemical Agents, Biological Agents, Explosives'; Disease and Narcotics |
| whereupon detection of specific chemical, biological, or radiological agents or compounds by the detectors | … confirmation of the detection [] initiates signal transmission from the cpu … | Intel's Loihi Neuromorphic Chip for the Detection of Chemical Agents, Biological Agents, Explosives'; Disease and Narcotics |
| an Internet connection, a GPS connection, and a power connection … | an Internet connection … interconnected with the cpu | Intel's CPUs are Capable of Processing the Operational and Functional Instructions of "Intel's Vision" Internet of Things |
| 3. [t]he multi sensor detection … system … further comprising a fingerprint biometric lock with disabler … for disabling and locking the lock … capable of being reset by the confirmation of an authorized fingerprint. | … for mounting to the lock of the product and interconnected to the cpu … | Intel's CPUs are Capable of Processing the Operational and Functional Instructions of the Intel-based Laptops Equipped with Fingerprint Scanners |
| Claim 1 of Plaintiff's '619 Patent | Plaintiff's Central Processing Unit (CPU) | Duplicate Intel Project |
| A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner … | comprising at least a central processing unit (CPU), capable of: … processing instructions to activate a … a start, stall, stop, or disabling vehicle means | Intel's Mobileye CPUs are Capable of Processing the Operational and Functional Instructions for Driverless & Autonomous Vehicles |

In order to resolve the question concerning the scope of liability for contributory infringement the Federal Circuit focused its inquiry on the interpretation of the Supreme Court's decision in *Metro-Goldwyn-Mayer Studios v. Grokster* (finding infringement where a component adapted for use in a patented process and with no substantial non-infringing use would be "good for nothing else" but infringement of the patented process).

Intel design processors for the OEMs trial use. The OEMs either accepts the processors as is, or design their desktop PCs, laptops, and advanced driver assistance systems around the specific requirements of the Intel processors. This process has no substantial non-infringing use but infringement of the Plaintiff's patented inventions / process.

Plaintiff has demonstrated throughout this complaint that the OEMs desktop PCs and Laptops are more likely to infringe Plaintiff's patent claims, than not.

Another example of how Intel contributed to allegedly infringing Plaintiff's CMDC device with the use of CPUs that allegedly infringe Plaintiff's CPUs, are illustrated below:

I.  Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone; laptop; tablet; etc.) – Claim 23 of the '439 Patent

   a. ***Central Processing Units for CMDC Device – Claim 5 of the '287 Patent***
   b. Camera CBR Sensor(s) for CMDC Device – Claim 4 of the '189 Patent
   c. Smartwatch CBR Detector for CMDC Device – Claim 19 of the '439 Patent
   d. Embedded CBRN Sensors for CMDC Device – Claim 16 of the '439 Patent
   e. Interchangeable Sensors for CMDC Device – Claim 20 of the '439 Patent
   f. NFC CBR Tag for CMDC Device – Claim 21 of the '439 Patent
   g. Remote/Electrical Lock for CMDC Device – Claim 125 of the '990 Patent
   h. Pre-Programmed Lock for CMDC Device – Claim 1 of the '287 Patent
   i. Fingerprint / Face Recognition for CMDC Device – Claim 1 of the '619 Patent
   j. Stall, Stop, Slowdown for CMDC Device – Claim 11 of the '891 Patent
   k. Vehicle Monitoring with CMDC Device – Claim 44 of the '891 Patent
   l. Connect Vehicle with CMDC Device – Claim 4 of the '287 Patent
   m. Internet-of-Things (IoTs) with CMDC Device – Claim 11 of the '619 Patent

## I. Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone) – Claim 23 of the '439 Patent



Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween …

**Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone)**

**Claim 23 of the '439 Patent**: "A cell phone comprising: a central processing unit (CPU) for executing and carrying out the instructions; … whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems … multi-sensor detection systems, or to activate or deactivate the cell phone detection device;

"In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals

Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, …, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite phones, cell phones, … handhelds;

### a. *Central Processing Units (CPUs) for CMDC Device – Claim 5 of the '287 Patent*



Example: **Claim 1 of the '619 Patent**: A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of … processing instructions …

**Central Processing Units (CPUs) for CMDC devices**

**Claim 5 of the '287 Patent**: A monitoring device, comprising: at least one central processing unit (CPU) … at least one of a transmitter or a transceiver in communication with the at least one CPU configured to … send signals to lock or unlock doors, send signals to control components of a vehicle, … or send signals to detect … chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

The "smartphone [laptop] processor (CPU), also known as chipset, is a component that controls everything going on in your smartphone and ensures it functions correctly. You can compare it to the brain of the human body. Every action you perform on your smartphone goes straight to the processor." https://www.coolblue.nl/en/advice/smartphone-processors. html. "[T]oday's smartphones [desktops] all have processors or CPUs. A smartphone [tablet] CPU (central processing unit) is the brains of the entire device. Without one, no smartphone would be able to function" (smartphonedomain.com., 2021).

**b. Camera CBR Sensor(s) for CMDC Device – Claim 4 of the '189 Patent**







### Camera CBR Sensor(s) for Smartphone

Camera Sensor for Radiological Detection: How can a cell phone detect radioactivity? Cell phones have cameras and camera sensors react to radioactivity. High energy particles strike a sensor array and register as small bright pinpoints or thin streaks of light. An app … works well enough to alert users to dangerous levels of radiation.

Camera Sensor for Biological Detection: "In the diagnostic test, a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. Coronavirus RNA present, CRISPR proteins snip the molecular probes, whole sample to emit light. Fluorescence detected with a cell phone camera." (Image: Science at Cal).

Camera Sensor for Chemical Detection: The sensor *Rhevision* and UC San Diego responds to different chemicals by changing color; a single chip with many tiny pores, each respond to a different chemical; a standard cell-phone camera can detect them; the phone's camera watches the chip for color changes.

**Claim 4 of the '189 Patent**: A built-in, embedded multi sensor detection system … sensor array or fixed detection device into the product that detects agents …

**c. Smartwatch CBR Detector for CMDC Device – Claim 19 of the '439 Patent**



Homeland Security's Smartwatch Will Detect Nuclear Bombs https://www.popular-mechanics.com/military/research/a18161/ homeland-security -smartwatch-detect-nuclear-bombs/

### Smartwatch CBR Detector for Smartphone

**Claim 19 of the '439 Patent**: A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising: a plurality of sensors … capable of being disposed within, on, upon or adjacent a multi-sensor detection device.

The US Military's Latest Wearables [Smart Watch] Can Detect Illness Two Days Before You Get Sick https://www. defenseone.com/technology/2020/09/militarys-latest-wearables-can-detect-illness-two-days-you-get-sick/168664/

Studies reveal smartwatch biometrics can detect COVID-19: "smartwatches and other wearables measuring biometrics like heart-rate variability have the ability to detect if a person is COVID-19 positive" https://www.biometricupdate.com/ 202101/studies-reveal-smartwatch-biometrics-can-detect-covid-19-before-symptoms-surface

### d. Embedded CBRN Nanosensors for CMDC Device – Claim 16 of the '439 Patent



**Embedded CBRN Sensors for Smartphone (NASA)**

**Claim 16 of the '439 Patent**: A built-in, embedded multi sensor detection system … a cell phone, a smart phone

A silicon-based sensing chip, which consists of 64 nanosensors can turn a cell phone into a *portable poison detector*. (NASA). "can turn your cellphone into a *portable "silent killer" detector* https://www. foxnews.com/tech/smartphones-take-on-silent-killers-as-portable-danger-detectors & Nuclear Radiation Nanosensors and Nanosensory Systems https://link.springer.com/book/10.1007/978-94-017-7468-0

### e. Interchangeable Sensor Device for CMDC Device – Claim 20 of the '439 Patent



**Plurality of Interchangeable Sensor Device for Smartphone: (NASA & Subtractor George Yu)**

**Claim 20 of the '439 Patent**: A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agents…

The system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform. A cylinder that transmits data from sensors to smartphone. The NODE+ is compatible with Android and Apple smart devices.

### f. NFC CBR Tag for CMDC Device – Claim 21 of the '439 Patent



MIT-- wirelessly detect hazardous gases by using a simple sensor made from near-field communication (NFC) tags that can be read by a smartphone… detect gaseous ammonia, hydrogen peroxide, and cyclohexanone, and other gases… Sensors. Retrieved from: https://phys.org/news/ 2014-12-cheap-sensor-transmit-hazardous-chemicals.html

**Near-Field Communication (NFC) CBR Tag for Smartphone (Safer than RFID tag)**

**Claim 21 of the '439 Patent**: A multi-sensor detection system … at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication

In November 2007, two Defense Department contractors, and a U.S. city's bomb squad demonstrated how an RFID tag could send a signal to … detonated a small amount of explosives in a container a simple emission of a radio signal traveling on the approved RFID 433 MHz frequency. Officials from the Defense Department and DHS observed the demonstration. https://www.nationaldefense-magazine.org/articles/2011/2/1/2011february-military-supply-chain-tracking-system-both-inefficient-and-dangerous

## g. Remote/Electrical Lock Disabler for CMDC Device – Claim 125 of the '990 Patent



**Remote/Electrical Lock Disabler for Smartphone (Gov. Contractor iControl's MATTs & mLOCK)**

**Claim 125 of the '990 Patent**: A multi-sensor detection system … whereupon detection causes a signal to be sent to the at least one communication device followed by communicating with the internal or external remote/electrical lock disabler.

Marine Asset Tag Tracking System (MATTS) is a DHS initiative for "Smart Container". MATTS "gateway": a wireless electronic device that communicates with a sensor array; the communication device; and locking mechanism for locking status and GPS location. Internal /external sensors are interconnected to operate with the MATTS device and can detect gas concentrations, radiation, humidity and moisture, atmospheric pressure, etc. The mLOCK communicates bi-directionally using encrypted messages between the lock and the MATTs readers or mobile devices (i.e., smartphone)

## h. Pre-Programmed Lock Disabler for CMDC Device – Claim 1 of the '287 Patent





"Monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock…"

**Pre-Programmed Lock Disabler for Smartphone**

Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android or iOS device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Account Login. On an Android or Apple Phone, multiple attempts (usually five attempts or more) with an unknown or a wrong pin will go either into a delay before further attempts are allowed …

FBI Failed Attempts to Unlock Phone: The FBI recovered an Apple iPhone 5C—owned by the San Bernardino County, California government—that had been issued to its employee Syed Rizwan Farook, one of the shooters involved in the December 2015 San Bernardino attack. The attack killed 14 people and seriously injured 22. The two attackers died four hours after the attack in a shootout with police … Authorities were able to recover Farook's work phone, but could not unlock its four-digit passcode, and the phone was programmed to automatically delete all its data after ten failed password attempts (an anti-theft measure on smartphones).

**Claim 1 of the '287 Patent**: Monitoring equipment that is at least one … a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries;

### i. Fingerprint and Face Recognition for CMDC Device – Claim 1 of the '619 Patent



**Fingerprint and Face Recognition for Smartphone**

**Claim 1 of the '619 Patent**: A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of: processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition

### j. Stall, Stop, or Vehicle Slowdown for CMDC Device – Claim 11 of the '891 Patent



Two security experts in the US have demonstrated taking control of two popular models of car, while someone else was driving them, using a laptop. said they hoped to raise awareness about the security issues around computer-dominated car control

**Stall, Stop, or Vehicle Slowdown for Laptop**

**Claim 11 of the '891 Patent**: A vehicle adapted for receipt of a signal from a remote location to control the vehicle's stall-to-stop means or vehicle slowdown means, comprising: at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor;

Remote Vehicle Shutdown is a system of remotely shutting down the connected vehicle, using radio pulses; intended for police, military and security use. Remotely find and disable stolen vehicles; ability to prevent engine start; prevent movement of a vehicle; stop or slow an operating vehicle; gradually decelerate a vehicle by downshifting, limiting the throttle capability; and, improve security of carriers of high-risk cargo, like hazardous materials. Security features that Remote Vehicle Shutdown provides.
https://www.globenewswire.com/en/news - release/2019/12/17/1961557/0/en/Remote-Vehicle-Shutdown

### k. Vehicle Monitoring with CMDC Device – Claim 44 of the '891 Patent



**Autonomous and Driverless Vehicle Monitoring with Laptop**

**Claim 44 of the '891 Patent**: A vehicles' stall-to-stop system or vehicle slowdown system in signal communication with a pre-programmed automated system is adapted, modified, or designed to control the vehicles' stall-to-stop means or vehicle slowdown means … (Dep. 55) … 44, further can be adapted, modified or designed to include a vehicle designed to perform as a driverless or autonomous vehicle … in operation with or without a user, driver or operator inside the vehicle.

## l. Connect Vehicle with CMDC Device – Claim 4 of the '287 Patent



### Connect Vehicle with Smartphone

**Claim 4 of the '287 Patent**: A monitoring device, comprising: at least one central processing unit (CPU) … at least one of a transmitter or a transceiver in communication with the at least one CPU configured to … send signals to lock or unlock doors, send signals to control components of a vehicle, … or send signals to detect … chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

**CarLink™** is a Smartphone interface that allows you to start your vehicle, unlock your doors or pop the trunk from virtually any distance, or help you find your car in a large garage after a sporting event or a trip to the mall. *Compatible with iPhone, BlackBerry and Android *Remote Start Compatible *Door lock and unlock *Car find feature (horn honk and/or flashing lights) *Control trunk release or sliding door open)

## m. Internet-of-Things (IoTs) with CMDC Device – Claim 11 of the '619 Patent



The smartphone/laptop can be used as an IoT device for Personal emergency response, fitness tracking, location-based asset tracking, natural vision processing, and a Bluetooth gateway for wearable Bluetooth devices that enable many IoT monitoring apps. Also, identity verification, GPS based guidance, position/orientation awareness apps for smartphone/laptop-based implementation.

### Internet-of-Things (IoTs) with Smartphone/Laptop

**Claim 11 of the '619 Patent**: A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of: processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device

The Internet-connected smartphones, can directly capture and compile data from as many as 14 different sensors:
Accelerometer, GPS, Gyroscope, Magnetometer, Biometrics, Camera, Barometer, Proximity Sensors, Bluetooth connectivity, Barcode readers, Touchscreen sensors, Heart rate monitor, ECG, Haptic feedback sensors

The IoTs contain computing hardware, including processors with embedded programming telling them what to do, sensors that gather various sorts of readings (such as temperature, motion, chemical levels, heart rate and body movement) and communication hardware that can send and receive signals.

Defendant raised a disingenuous analogy about Plaintiff's illustrative Claim Charts. The Defendant's analogy denotes that no similarity exists in the characteristics of the two relatively different claim charts Plaintiff presented in two separate cases.

The first claim chart is an illustration of the similarities and the differences [no two patent claims can be exactly the same] of the 25 asserted patent claims of 5 of Plaintiff's patents. Defendant referenced the claim chart as a "a dizzying array of disorganized assertions over several hundred pages, disingenuously using the words of the claims to generally describe cryptically identified structures."

> III. PLAINTIFF USES A "DIZZYING ARRAY OF DISORGANIZED ASSERTIONS" AND "DISINGENUOUSLY" QUOTES LANGUAGE FROM HIS PATENTS...... 8
> > In a 2020 per curium opinion of the Federal Circuit, the court unanimously affirmed dismissal of an action concerning the same patents at issue here:
> > > The complaint also references "claim charts" for each defendant and each patent. E.g., id., ECF No. 16-14. These claim charts present a dizzying array of disorganized assertions over several hundred pages, disingenuously using the words of the claims to generally describe cryptically identified structures ...

> Plaintiff attempts to allege both direct infringement (Complaint, ¶¶ 21, 77). and some type of notion of contributory infringement (Id. at ¶¶ 76-83). In support of these allegations, plaintiff includes "claims charts" from his previous cases. (See, e.g., Complaint, ¶ 35 and the exhibits attached to Plaintiff's complaint). The Federal Circuit previously reviewed similar material, calling plaintiff's charts "a dizzying array of disorganized assertions over several hundred pages, disingenuously using the words of the claims to generally describe cryptically identified structures." *Golden v. Apple Inc.*, 819 F. App'x 930, 931 (Fed. Cir. 2020), cert. denied, 141 S. Ct. 1067, 208 L. Ed. 2d 530 (2021).

The first claim chart was voluntarily presented by Plaintiff to illustrate one (1) limitation of the twenty-five (25) asserted claims cannot be the basis for eliminating or terminating the remaining twenty-four (24) patent claims. A segment of the claim chart is attached as **Exhibit B**.

Example: In a related COFC Case No. 13-307C, *Golden v. USA*, the Court rejected the illustrative claim chart and ordered Plaintiff to submit a claim chart that will display an element-by-element break-down of the patent claim and the alleged infringing element of the product.

Plaintiff's case was dismissed because the Court determined Plaintiff "did not show where the signal was located that was sent to lock the product after chemical, biological, or

radiological detection". Plaintiff satisfied the requirement with the integration of the government's TRUST initiative; MATTS initiative; and, mLOCK initiative.

When you look at the illustrative claim chart attached as **Exhibit B**, you're see that the requirement is only relevant to two (2) of the asserted patent claims [claim 1 of the '497 patent and claim 10 of the '752 patent] and relevant to providing direct infringement under 28 U.S.C. § 1498(a)—Government Infringement. The Court erred when the Court dismissed Plaintiff's remaining 23 patent claims asserted in the case.

The illustrative claim chart attached as **Exhibit B** will display a "biometric disabling lock that locks the device after multiple failed attempts to open the device by an unauthorized user". This requirement is relevant to seventeen (17) of the asserted patent claims [claim 1 of the '497 patent; claim 10 of the '752 patent; claims 1, 2, 4, 7, & 8 of the '189 patent; claims 13, 14, 16, 19, 20, 22, & 23 of the '439 patent; and, claims 4, 5, & 6 of the '287 patent] and relevant to proving direct infringement under 35 U.S.C. § 271(a)—Patent Infringement by Private Entity. The Court erred when the Court ordered Plaintiff to prove direct infringement of the private entities—Apple, Samsung, LG—under 35 U.S.C. § 271(a) as a necessary predicate to proving direct infringement under 28 U.S.C. § 1498(a), and dismissed Plaintiff's case.

The illustrative claim chart attached as **Exhibit B** will also display the remaining 8 patent claims asserted in the case [claims 3, 5, 6, & 9 of the '189 patent; claims 15, 17, 18, & 21 of the '439 patent], which does not include a limitation for lock. Therefore, dismissal is improper.

The same example described above concerning the use of Plaintiff's illustrative claim chart attached as **Exhibit B** is relevant to the Court's theory that Plaintiff "did not show a sensor or detector that detects for hazardous agents or chemicals". Here again the Court's review of Plaintiff's patent limitations is wrong. The charts are relevant and are not "dizzying".

Plaintiff's **Exhibit C** is a segment of the Preliminary Infringement Contentions Claim Chart of Samsung, Plaintiff was ordered to submit. Plaintiff was ordered to submit a Preliminary Infringement Contentions Claim Chart that will display an element-by-element break-down of the patent claim and the alleged infringing element of the product.

The contentions claim chart, **Exhibit C** describes in great detail [enough factual allegations] the function of each element and whether Plaintiff is alleging the patent claim is being directly infringed or infringed under the "doctrine of equivalents".

## EVIDENCE HAS BEEN ENTERED INTO RECORD OF PLAINTIFF'S OWNERSHIP OF THE PATENT RIGHTS FOR THE CMDC DEVICE (i.e., NEW, USEFUL, & IMPROVED UPON, CELL PHONE)

Plaintiff declares he is the inventor of a new, useful, improved upon cell phone. The cell phone is best recognized today as the smartphone. Plaintiff owns the patent rights for the new, useful, improved upon cell phone (e.g., smartphone, etc.).

*35 U.S. Code § 101 - Inventions patentable: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." (July 19, 1952, Ch. 950, 66 Stat. 797.)*

Defendant Intel in this case, and the Court Judges in other related cases has shared their disbelief in their comments and opinions. Plaintiff recalls a telephone conversation with the Government's Attorney in the related case no. 13-307C *Golden v. USA*, where the Plaintiff asked the Attorney, "so what you are telling me is, you will never believe I invented the smartphone"; the Attorney's reply was "NO!"

It's obvious the Judges feel the same because they are quick to believe Plaintiff's case is to 'fantastic' and 'unbelievable' (*frivolous*). Following the Dred Scott Supreme Court decision, the Courts have not gotten beyond, "blacks are only two-third human", blacks cannot own property because they are property themselves", and "blacks can't invent because they do not have the brains' for that". Of course, someone had to invent the smartphone, but not a Black (African-American) man.

In this case Plaintiff has submitted into record, seven of Plaintiff's patents that are issued with the *presumption of validity* to show Plaintiff owns the patent rights to the "smartphone".

*35 U.S.C. § 282(a). In General. A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity. [must prove invalidity on the heightened standard of clear and convincing evidence]*

Plaintiff has also presented a sample illustrative claim chart for comparing patent claims' limitations; a sample element-by-element infringement contentions claim chart; and in this document, charts of Plaintiff's individual inventions that forms the smartphone.

Plaintiff has described his smartphone invention as a communicating, monitoring, detecting, and controlling (CMDC) device, that is grouped together by common features of design similarities of at least that of a cell phone, smartphone, laptop, tablet, desktop PC, PDA, or smartwatch.

Plaintiff has presented at least 45 patent claims that covers Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device. Plaintiff is able to describe the new, useful, improved upon cell phone as a CMDC device in one (1) patent claim. Claim 23 of the '439 patent:

| Claim 23 of Plaintiff's '439 Patent | |
|---|---|
| **PREAMBLE** | ***A cell phone comprising:***<br>a central processing unit (CPU) for executing and carrying out the instructions of a computer program; |
| **COMMUNICATING** | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; |
| **MONITORING** | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; |
| **DETECTING** | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; |
| **CONTROLLING** | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; |

# SUMMARY JUDGEMENT FOR INTEL'S
# UNJUST ENRICHMENT

The U.S. Federal Trade Commission: "Intel has engaged in a deliberate campaign to hamstring competitive threats to its monopoly," Richard Feinstein, director of the FTC's Bureau of Competition, said in a statement. "It's been running roughshod over the principles of fair play and the laws protecting competition on the merits. The commission's action [] seeks to remedy the damage that Intel has done to competition, *innovation*, and, [] the American consumer."

## Antitrust Injury:

The elements of unjust enrichment exist for Intel because: 1) Plaintiff provided something of value to the defendant Intel; 2) Intel acknowledged, accepted and benefitted from what Plaintiff provided; and, 3) it would be inequitable for Intel to enjoy the benefit Plaintiff provided without compensating Plaintiff.

The Federal Trade Commission Act bans "unfair methods of competition" and "unfair or deceptive acts or practices." The Supreme Court has said all violations of the Sherman Act also violate the FTC Act.

Intel's collusion, exclusive arrangements, and conspiracy to hinder trade, has destroyed all possibilities for the Plaintiff to receive royalty compensation for Plaintiff's patented CPUs. As a result of Intel's "systematic campaign" of illegal conduct to maintain its monopoly, with the unauthorized use of Plaintiff's patented CMDC devices (desktop PCs, laptops, tablets); Intel has harmed Plaintiff, harmed competition, and unjustly enriched itself.

This injury is of the type the antitrust laws were intended to prevent; which makes the defendant's conduct unlawful.

Plaintiff believes Intel has unjustly enriched itself [the doctrine of unjust enrichment allows a plaintiff to recover from a defendant, without the benefit of an enforceable contractual obligation, where the defendant has unfairly benefited from the plaintiff's efforts without compensation].

Plaintiff has alleged Intel has, and is currently using Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices (i.e., "[a] communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal at a monitoring site for monitoring products for communication therebetween,

comprising….”; and, Plaintiff's central processing units (CPUs), i.e., the “brains” of the CMDC devices. No CMDC device—laptop or desktop PC—can function without at least one central processing unit (CPU).

**Intel's Forward Look and Actual Annual Revenues**
*– Data retrieved from macrotrends.net*

| | |
|---|---|
| 2026 | $79.024B |
| 2025 | $79.024B |
| 2024 | $79.024B |
| 2023 | $79.024B |
| 2022 | $79.024B |
| 2021 | $79.024B |
| 2020 | $77.867B |
| 2019 | $71.965B |
| 2018 | $70.848B |
| 2017 | $62.761B |
| 2016 | $59.387B |
| 2015 | $55.355B |
| 2014 | $55.870B |
| 2013 | $52.708B |
| 2012 | $53.341B |
| 2011 | $53.999B |
| 2010 | $43.623B |
| **Total Revenue** | **$1,131.868B** |

Intel has had nine (9) years to present a patent(s) that proves Intel has patent rights to exclude others from making, using, selling, or offering for sale, a CMDC device of at least that of a desktop PC, laptop, tablet, smartphone, or new and improved cell phone. Intel has failed to produce evidence that Plaintiff's patents as invalid.

Plaintiff is entitled to stop Intel's use of the Plaintiff's inventions to generate hundreds of billions of dollars of dollars in revenue by seeking a legal injunction in Federal court. court.

Intel's anticompetitive practices has restrained Plaintiff from entering the market to collect royalties on his patented inventions. Plaintiff is entitled to collect damages for any unlicensed use of his inventions. Damages are generally calculated based on lost profits Plaintiff suffered as a result of the use.

### Intel vs Competitors: Semiconductor Revenue

How much does Intel make from semiconductors compared to other major manufacturers?



Intel (blue) $70.24B / Samsung (yellow) $56.20B

Intel made $70.24 billion from semiconductors in 2020 and was the leading company in the segment.

Pursuant to FRCP Rule 56: Plaintiff has shown that there is no genuine dispute as to any material fact; no reason to prolong summary judgement in this case; and, no genuine dispute as to who own the patent rights for the CMDC devices Intel is unjustly enriching itself with. Plaintiff is entitled to judgment as a matter of law.

# SUMMARY JUDGEMENT ON THE VALIDITY OF PLAINTIFF'S PATENTS AND PATENT CLAIMS

Intel will want to be aware of the evolving law of estoppel, as it can have significant consequences. *In California Institute of Technology v. Broadcom Ltd.*, No. 16-cv-03714 (C.D. Cal.), for example, *Broadcom* could not pursue its litigation invalidity contentions due to petitioner estoppel. As a result, only infringement and damages were before the jury, which returned a verdict on Jan. 29, 2020, of infringement and awarded $1.1B in damages.

The Supreme Court's decision in *SAS Institute, Inc. v. Iancu*, 138 S.Ct. 1348 (2018) (*SAS*), made institution of IPR petitions an "all or nothing" game; an institution decision must be binary—either all challenged claims are instituted, or all are denied.

Which means either all of Plaintiff's patent claims [over 85] of all of Plaintiff's issued—presumed valid—patents [10], that covers Plaintiff's stall, stop, vehicle slowdown systems (i.e., Advanced Driver Assistance Systems ADASs)); Plaintiff's CMDC devices (i.e., new, useful, or improved upon cell phones, desktop PCs, laptops, tablets) must be instituted and found invalid.

Any *one* of Plaintiff's patent claims [over 85] that is not instituted, is recognized as being *valid* and can be used by Plaintiff to prove infringement. It is also unlikely Defendant will be able to prevail on the heightened standard of "clear and convincing" evidence in District Court that all of Plaintiff's patent claims [over 85] are invalid considering the extent of previous IPR review, re-issue prosecution; and, nine years of Government challenges at the U.S. Claims Court.

Plaintiff's patent specifications and patent claims was challenged at the USPTO in 2009-2001 on the grounds of 112 & 120. Plaintiff's patent specifications and patent claims was challenged at the USPTO-PTAB in 2014-2015 on the grounds of 101, 102, 112 & 120 [the 3 patent references that do not antedate Plaintiff's USPTO filing date; the 18 publications; and, the one Expert declaration submitted in the IPR were all submitted to the USPTO for prosecution examination in Plaintiff's '189, '439, '287, & '619 patents before the patents were issued]. Plaintiff's patent specifications and patent claims was challenged at the U. S. Court of Federal Claims in 2019-2021 on the grounds of 112 & 120. The USPTO patent prosecution history of references is attached as **Exhibit D**.

Pursuant to FRCP Rule 56: Plaintiff has shown that there is no genuine dispute as to any material fact; no reason to challenge the validity of Plaintiff's patents and patent claims; no reason to prolong summary judgement in this case; and, no genuine dispute as to who own the

patent rights for the CMDC devices Intel is unjustly enriching itself with. Plaintiff is entitled to judgment as a matter of law.

The prosecution history of references is attached as Exhibit D.

## **RELIEF**

Plaintiff is seeking summary judgement against Intel for contributory infringement and unjust enrichment. Under Federal Circuit precedent, indirect (contributory) infringement requires a patent owner [Plaintiff] to show that the alleged infringer [Intel] had the specific intent to cause direct infringement. Plaintiff has satisfied this requirement.

The Federal Circuit has essentially broken the statute for contributory infringement down into four elements. More specifically, in order to establish contributory infringement, the court has held that a patent owner [Plaintiff] must show: (1) that there is direct infringement, (2) that the accused infringer [Intel] knew that the combination for which its components were being made was both patented and infringing, (3) that the component has no substantial noninfringing uses, and (4) that the component is a material part of the invention. *Fujitsu*, 620 F.3d at 1326 and 1330. The second element was essentially reaffirmed by the Supreme Court in Global-Tech, which stated that § 271(c) requires knowledge (**Exhibit A**) of the existence of the patent and knowledge that the component infringes. *Global-Tech*, 131 S. Ct. at 2069.

Pursuant to FRCP Rule 56: Plaintiff has shown that there is no genuine dispute as to any material fact of Plaintiff's claim that Intel has unjustly enriched itself with the use of Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices (i.e., "… of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal … monitoring products for communication therebetween, …."; and, Plaintiff's central processing units (CPUs), i.e., the "brains" of the CMDC devices. Plaintiff is entitled to judgment as a matter of law.

A. Summary judgement on the merits of the case for Intel's single-firm anticompetitive conduct (under section 2 of the Sherman Act), and unjust enrichment.

B. Summary judgement on the merits of the case for contributory infringement; and willful infringement.

C. Summary judgement on the merits of the history of Plaintiff's patent prosecution and challenges; that Plaintiff's patents and patent claims are valid.

D. Damages found or assessed for Intel's single-firm anticompetitive conduct (under Section 2 of the Sherman Act), that has cause Antitrust injury to the Plaintiff, in the amount of $20 billion dollars. $20B is only **1.8%** of the total revenue ($1.131T) Intel received for the years 2010-2021, plus the projected amount Intel will receive for years 2022-2026.

E. Damages found or assessed for contributory infringement that has cause injury to the Plaintiff, in the amount of $20 billion dollars. $20B is only **1.8%** of the total revenue ($1.131T) Intel received for the years 2010-2021, plus the projected amount Intel will receive for years 2022-2026.

F. Trible damages for the Antitrust injury imposed by Intel for violating Federal Antitrust Laws (Section 4 of the Clayton Act, 15 U.S.C.S. § 15, provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue" for treble damages, prejudgment interest, and costs of suit, including attorney fees.

G. The Court orders Intel to establish, at minimum, a $20 billion dollar reserve with the SEC for "Probability of the Incurrence of a Loss". The reserve is returned to Intel if found not liable.

Sincerely,

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 9th day of August, 2022, a true and correct copy of the foregoing "Plaintiff's Response to Intel's Motion to Dismiss and Plaintiff's Cross-Motion for Summary Judgement", was served upon the following Defendant by priority "express" mail:

Richard Tyler Atkinson

McManis Faulkner

50 West San Fernando Street, 10th Floor

San Jose, CA 95113

(408) 279-8700

Fax: (408) 279-3244

Email: tatkinson@mcmanislaw.com

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605