# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA (SAN JOSE)

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net

| | |
|---|---|
| LARRY GOLDEN<br><br>*Pro Se* Plaintiff,<br><br>V.<br><br>INTEL CORPORATION.<br><br>Defendant. | CASE NO: <u>5:22-cv-03828-NC</u><br><br>**(JURY TRIAL DEMANDED)**<br><br>**(Sherman Act) (The Clayton Act) (Unjust Enrichment) (Contributory Infringement).**<br><br>September 26, 2022 |

## <u>PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS AND PLAINTIFF'S NOTICE OF AUTHORITY IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGEMENT</u>

In Intel's Motion to Dismiss, Intel proceeded to give a long dialogue on how subject matter of Plaintiff's case does not have jurisdiction; how Plaintiff has not made a claim that entitles him to relief; how Plaintiff's charts are just a "dazzling array"; and, that Plaintiff's complaint is "frivolous".

On 09/08/2022, the Federal Circuit issued opinions in three of Plaintiff's cases that Intel has relied on for a motion to dismiss under 12(b)(1) and 12(b)(1).

The Federal has determined Plaintiff's cases are not facially frivolous; the charts are not a dazzling array; the District Court has jurisdiction; and, that Plaintiff owns the patent rights for a CMDC device that is at least a new cell phone, smartphone, desktop PC, tablet, and laptop.

**In *Golden v. Google LLC*, No. 2022-1267**

The Federal Circuit ***"Vacated and Remanded"*** Plaintiff's case against Google for the following reason:

"LARRY GOLDEN, Plaintiff-Appellant v. GOOGLE LLC, Defendant, Appeal from the United States District Court for the District of South Carolina in No. 6:21-cv-00244-JD, Judge Joseph Dawson, III." … "On January 26, 2021, in Case No. 22-1267, Mr. Golden separately sued Google LLC for patent infringement ("the Google case"). "In the Google case, the district court dismissed the complaint with prejudice and without the issuance of service of process… We have jurisdiction under 28 U.S.C. § 1295(a)(1). On appeal, Mr. Golden has filed briefs, while the defendants have not filed responsive briefs." … "In the Google case, the district court again concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189. The district court discounted this claim chart because it "contains the exact same language as the claim charts previously rejected by the Federal Circuit [in the 2019 case], although Google Pixel 5 Smartphone appears in the far-left column instead of Apple." Dist. Ct. Op. at 4. But to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to. The key column describing the infringing nature of the accused products is not the same as the complaint held frivolous in the 2019 case. It attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straightforward manner." … "We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart. On remand, the district court should allow the complaint to be filed and request service of process. … We express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous." … "For the foregoing reasons, we … vacate the dismissal in Case No. 22-1267, and remand for further proceedings consistent with this opinion. **Exhibit A**

The Federal Circuit acknowledge the sufficiency of Plaintiff's charts, which validates Plaintiff's patented rights for a CMDC device [claim 5 of the '287 patent]; a new and improved cell phone [claim 23 of the '439 patent]; and, a communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop… [claim 1 of the '189 patent].

The three patent claims above represent only 3 of the 23 patent claims asserted in this case for Plaintiff's '287, '439, and '189 patents. The Federal Circuit stated: "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "[w]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims …."

Intel has failed to show any significant differences between Apple, Samsung, LG, and Google smartphones, or any significant differences between Dell, HP, Lenovo, AIM laptops, desktops, tablets that separates any one brand of smartphones, laptops, desktops, tablets, from any other brand of smartphones, laptops, desktops, tablets. Plaintiff alleges Intel is unlawfully "using" the laptops, desktops, and tablets to unjustly enrich itself.

Plaintiff has introduced into evidence, and now the Federal Circuit has confirmed: Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device comprises products grouped together by common features of design similarities, that include, but is not limited to: new and improved cell phones, laptops, tablets, desktop PCs; and, smartphones.

Therefore, the same opinion the Federal Circuit provided for the Google smartphones applies to Intel's alleged infringing "use" of laptops, desktops PCs, and tablets covered under Plaintiff's patents. Plaintiff has a right to exclude Intel's "use" of his patented invention(s) to generate hundreds of billions of dollars in revenue. There's only a few, if any, laptops, desktops PCs, tablets, and smartphones that are not covered by Plaintiff's patents.

Plaintiff has attached **Exhibit B**, *Larry Golden v. Google LLC* case (USDC-SC Case No. 6:21-cv-00244-JD) that "includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189. The following chart uses the same claims of the same '287, '439, and '189 patents the Federal Circuit reviewed in the Google case. The difference is, the Intel chart identifies element-by-element how Intel has contributed to the infringement of Plaintiff's patents.

| CMDC Devices (i.e., Dell, HP, Lenovo, AIM laptops, desktops, tablets, etc.) that Incorporates Intel Components | Patent #: 10,163,287; Independent Claim 5 | Patent #: 9,589,439; Independent Claim 23 | Patent #: 9,096,189; Independent Claim 1 |
|---|---|---|---|
| <br><br>**Specifications of Patents:** "In addition, the basic monitoring terminal … can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, | A monitoring device, comprising: | A cell phone comprising: | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: |
| **Intel Core** is a line of computer central processing units (CPUs) marketed by Intel Corporation. The Core processors includes the Intel Core i3, Intel Core i5, Intel Core i7, and Intel Core i9, the X-series of Intel CPUs.<br><br><br><br>Intel Core i7 as an Intel brand name applies to several families of desktop and laptop 64-bit x86-64 processors | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; |

4

| | | | |
|---|---|---|---|
| Modern laptops with Intel CPUs have lots of temperature sensors built-in. Typically found: 1 in CPU; 1 extra in each CPU core (so for a typical laptop, up to 4); 1-2 in motherboard chipset(s); 1 in each (hard) drive. Some laptops include additional sensors: on the heat pipes, battery, some spot in the case, memory slots, and raid controllers | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | X | X |
| Laptops with motion control: HP Chromebook 14 [CPU: 1.83GHz Intel Celeron N2940 processor] and the HP Envy 17 Leap Motion SE TouchSmart notebook [Intel Core i7-4702MQ (2.2 GHz, 6 MB cache, 4 cores)]. The new sensor allows for 3D motion sensing, letting you gesture in the air above the sensor to interact with an array of apps and usability tools on the PC | at least one motion sensor in communication with the at least one CPU; | X | X |
| Today, all modern laptops and smart devices now come with infrared light detection sensors as standard allowing screens to illuminate when an object is nearby and go dark when it is not. Tablets with Ambient Light Sensor: AIM-65 8" Industrial Tablet with Intel CPU Processor [Intel Atom x5-Z8350 (4 core 1.44 GHz)] and Ambient Light Sensor | at least one viewing screen for monitoring in communication with the at least one CPU; | X | X |

| | | | |
|---|---|---|---|
| 10.1" Rugged Tablet for Windows with NFC, 4G, GPS, & WIFI: CPU: 8th Generation KBL-R Intel® Core™ i5-8250U, 4M Cache, 3.40 GHz; Optional CPU: Optional: 8th Generation KBL-R Intel® Core™ i7-8550U, max. frequency 4.0 GHz  | at least one global positioning system (GPS) connection in communication with the at least one CPU; | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; |
| 10.1" Rugged Tablet for Windows with NFC, 4G, GPS, & WIFI: CPU: 8th Generation KBL-R Intel® Core™ i5-8250U, 4M Cache, 3.40 GHz; Optional CPU: Optional: 8th Generation KBL-R Intel® Core™ i7-8550U, max. frequency 4.0 GHz  | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | wherein at least one of… WiFi connection, internet connection, radio frequency (RF) connection, cellular connection… capable of signal communication with the transmitter or the receiver; | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group… of satellite, Bluetooth, WiFi… |
| 10.1" Rugged Tablet for Windows with NFC, 4G, GPS, & WIFI: CPU: 8th Generation KBL-R Intel® Core™ i5-8250U, 4M Cache, 3.40 GHz; Optional CPU: Optional: 8th Generation KBL-R Intel® Core™ i7-8550U, max. frequency 4.0 GHz  | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | at least one of a… Bluetooth connection, WiFi connection, internet connection… cellular connection… short range radio frequency (RF) connection, or GPS connection; | X |

| | | | |
|---|---|---|---|
| Intel's Internet of Things (IoT) is a network of devices that create, modify, delete, send, and receive data between each other on their own; use data; make decisions  Intel's architecture and implementation of an Internet Of things based mobile application for a door lock security system This implementation has two devices i.e., Mobile and the Door, both are connected to the internet. The sensors connected to the internet (IoT) to be monitored remotely from anywhere in the world. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; | X |
| Power Management Settings for Intel® Wireless Adapters: You can use the power management options to enable a power-saving mode.  Power management lets you select a balance between power consumption (or battery life) and wireless adapter performance. Low-Power Saving and Medium Power Saving have the same effect on Intel® Wireless Adapters. The setting under Device Manager Power Management Tab Allow the computer to turn off this device to save power has no effect on Wi-Fi power management. | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | X | X |



HP Envy 13: Integrated UHD Graphics; Intel Core i7-1165G7; 13.3-inch FHD; Touchscreen Display; Fingerprint Scanner



Dell Vostro 15 5000 5510; Intel Iris Xe Graphics; 11th Generation Intel Core i7-11370H; 15.6-inch FHD (1920 x 1080); Anti-glare Display; Fingerprint Scanner



Lenovo IdeaPad 5; Intel Iris Xe Graphics; 11th Gen Intel Core i5-1135G7; 15.6" FHD WVA 300nits Anti-glare, 10-point Multi-touch Display; Fingerprint Scanner

| | | | |
|---|---|---|---|
| | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use |

| | | | |
|---|---|---|---|
| Intel's Loihi Neuromorphic Chip to Learn and Recognize the Scents of 10 Hazardous Chemicals.<br><br>Power Management Settings for Intel® Wireless Adapters: Power management lets you select a balance between power consumption (or battery life) and wireless adapter performance. | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween… |
| Intel's Loihi Neuromorphic Chip to Learn and Recognize the Scents of 10 Hazardous Chemicals. Below: Intel Labs' Nabil Imam holds a Loihi neuromorphic chip in his Santa Clara, California, neuromorphic computing lab. (Walden Kirsch/Intel Corp)<br> | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |
| 10.1" Rugged Tablet for Windows with NFC, 4G, GPS, & WIFI: CPU: 8th Generation KBL-R Intel® Core™ i5-8250U, 4M Cache, 3.40 GHz; Optional CPU: Optional: 8th Generation KBL-R Intel® Core™ i7-8550U, max. frequency 4.0 GHz<br> | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… | X | X |

| | | | |
|---|---|---|---|
| Intel has developed a new line of processors enhanced for IoT:<br><br>Intel Atom® x6000E CPU processor series and Intel® Pentium® and Intel® Celeron® N and J Series CPU processors. The processors build on new levels of CPU performance with integrated IoT features, real-time performance, manageability, security, and functional safety." https://www.intel.com/ | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or… detect at least one of a chemical biological… agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;<br><br>a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; |
| Intel's Internet of Things (IoT) is a network of devices that create, modify, delete, send, and receive data between each other on their own; use data; make decisions<br><br>Intel's architecture and implementation of an Internet Of things based mobile application for a door lock security system This implementation has two devices i.e., Mobile and the Door, both are connected to the internet. The sensors connected to the internet (IoT) to be monitored remotely from anywhere in the world. | X | X | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems |

| | | | |
|---|---|---|---|
| Intel's Internet of Things (IoT) is a network of devices that create, modify, delete, send, and receive data between each other on their own; use data; make decisions  10.1" Rugged Tablet for Windows with NFC, 4G, GPS, & WIFI: CPU: 8th Generation KBL-R Intel® Core™ i5-8250U, 4M Cache, 3.40 GHz; Optional CPU: 8th Generation KBL-R Intel® Core™ i7-8550U, max. frequency 4.0 GHz  | X | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection… short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; |
| Intel and Cornell trained Intel's Loihi neuromorphic chip to learn and recognize the scents of 10 hazardous chemicals … the activity of 72 chemical sensors in response to these smells and configured the circuit diagram of biological olfaction on Loihi. The chip quickly learned the neural representation of each of the smells and each odor, demonstrating a future for neuroscience and AI.  Intel's Loihi 2 neuromorphic chip | X | whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. | X |

## In *Golden v. US*, No. 2022-1196

The Federal Circuit affirmed dismissal of Plaintiff's case against the United States for the following reason:

> "We review the Claims Court's dismissal of a case pursuant to RCFC 41(b) for an abuse of discretion. *Claude E. Atkins Enters., Inc. v. United States*, 899 F.2d 1180, 1183 (Fed. Cir. 1990). "[T]he trial court's exercise of discretion will not be disturbed on appeal unless upon a weighing of relevant factors we are left with a definite and firm conviction that the court below committed a clear error of judgment." Id. "[I]n turn, Patent Rule 4 required Mr. Golden to prepare 'a chart identifying where each element of each asserted claim is found within each accused product, process, or method.'" "[M]r. Golden failed to identify in the accused products at least two key elements claimed in his patents: the sensor and locking limitations" *Golden v. US*, No. 2022-1196 **Exhibit C**

The Claims Court dismissed Plaintiff's case under RCFC Rule 41(b) for various reasons unsupported by facts. The case was not dismissed for non-infringement and/or patent invalidity.

See Plaintiff's "***Informal Petition for Rehearing En Banc***", filed in the case of *Golden v. US*, No. 2022-1196 for a list of "clear errors of judgement committed by the Claims Court. A copy is attached hereto as **Exhibit D**

## In *Golden v. Apple Inc. et al*, No. 2022-1229

The Federal Circuit affirmed dismissal of Plaintiff's case against Apple, for the following reason:

> "Mr. Golden does not argue that the docketed complaint contains factual allegations beyond those contained in his original complaint [the original complaint here refers to the original complaint file in the U.S. District Court for the District of South Carolina-Greenville in 2019] or that the allegations in the docketed complaint do anything beyond listing the alleged infringed-upon patent claims and the alleged infringing devices. This is plainly insufficient. We see no error in the district court without prejudice dismissal of the Apple case." *Golden v. Apple*, No. 2022-1229 **Exhibit E**

As noted above, the Federal Circuit affirmed that the Apple case [No. 2022-1229] is "dismissed without prejudice". In this present case, Plaintiff informed the Court in his Complaint docketed at 1, that the related case *Larry Golden vs. Apple Inc. et al*; Case No.: 6:20-cv-04353-JD-KFM Date Filed 11/02/21 Entry No. 26 was dismissed without prejudice.

Dismissed without prejudice is when a court dismisses a claim but leaves the plaintiff free to bring a subsequent suit based on the same grounds as the dismissed claim. *In Semtek Intern. Inc. v. Lockheed Martin Corp.*, the Supreme Court pointed out that one of the main features of dismissal without prejudice is that it does not prevent refiling of the claim…

> "a case that is dismissed "without prejudice" is only dismissed temporarily. This temporary dismissal means that the plaintiff is allowed to re-file charges, alter the claim, or bring the case to another court."

Plaintiff believe the Northern District of California is the proper venue to refile his claims against Intel because on May 22, 2017, the U.S. Supreme Court narrowed the scope of proper venue for patent infringement actions for domestic corporations. *See TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, No. 16-341 (May 22, 2017). The *TC Heartland* decision reverses the approach to venue previously adopted by the U.S. Court of Appeals for the Federal Circuit, which had held for 27 years that a domestic corporation can be sued for patent infringement anywhere that corporation was subject to personal jurisdiction.

The special venue statute for patent infringement actions, 28 U.S.C. § 1400(b), has two provisions permitting venue: "[1] where the defendant resides, or [2] where the defendant has committed acts of infringement and has a regular and established place of business."

Since the enactment of that statute, the Supreme Court consistently has interpreted Section 1400(b)'s first provision of proper venue— "where the defendant resides". *E.g., Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 226 (1957). As a result, a domestic corporation may now be sued for patent infringement only in its state of incorporation or where it has committed acts of infringement and has a regular and established place of business.

Intel based its entire defense on Intel's belief that "Plaintiff is a serial filer of *frivolous* complaints". The three authorities issued on 09/08/2022 from the Federal Circuit in Golden's cases, are presented above as evidence, this case is not *frivolous*.

# SUMMARY JUDGEMENT FOR CONTRIBUTORY (INDIRECT) PATENT INFRINGEMENT AGAINST INTEL

Issued patents are not *frivolous*. "A patent shall be presumed valid." 35 U.S.C. § 282. The courts have interpreted this statutory provision to mean that, in order for a challenger to prove that a patent is invalid for violating one of the provisions of the Patent Act, he must make such proof by the heightened standard of 'clear and convincing' evidence.

The rationale behind this statutory provision is that the PTO is a Federal agency that has already passed on the validity of the claims of issued patents. Patent examiners are presumed to be experts in the subject matter of reviewing patent applications and granting patents. Thus, for the initial Federal review by an expert to have any meaning, a challenger must present evidence that reaches a higher level than merely more likely than not.

Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., new and improved desktop PC, laptop, tablet, cell phone; or, smartphones) is designed through '*product grouping*' as an '*invention of inventions*' that's presumed valid.

## Contributory Infringement

Intel's liability for contributory infringement of Plaintiff's patent(s) is defined by 35 U.S.C. § 271(c): "Whoever offers to sell or sells within the United States ... a material or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, ... shall be liable as a contributory infringer."

The threshold requirement for a claim of contributory infringement is the existence of direct infringement. *See Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518 (1972). There must also be a showing that the alleged contributory infringer knew of the patent and that his or her actions would lead to infringement of the patent. *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476 (1964).

Intel was knowledgeable of Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices. Plaintiff is alleging facts that supports Plaintiff's claim that Intel had prior knowledge of Plaintiff's patented CPUs designed for Plaintiff's CMDC [handset] devices."

On 12/16/2010: Plaintiff's notice letters and licensing offer was mailed U.S. Postal Service, Certified Mail to Mr. Paul S. Otellini, President & CEO Intel, and Mr. Curt J. Nichols, VP Intel Capital Intel, at Mission College Blvd., Santa Clara, CA 95054-1549. Intel received and signed for the letters 12/20/2010. Phone: 408-765-8080. Tracking Nos: 7010 1870 0002 0193 0360 and 7010 1870 0002 0193 0377. (Attached as **Exhibit F** to this document; and, attached in this Case 5:22-cv-03828-NC, at Dkt. 1-7; filed 06/28/22)

Intel was given twelve (12) years to produce a patent(s) that invalidates Plaintiff's patents for Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., new and improved desktop PCs; laptops; tablets, etc.) and Plaintiff's Central Processing Units (CPUs). During the same time period Intel had every opportunity to negotiate a licensing agreement with Plaintiff.

The US District for the Eastern Court of Texas in *Motiva Patents, LLC v. HTC Corporation,* E.D. Texas, 9:18-cv-00179 (Oct. 2019), ruled that having a policy of ignoring others' patents is sufficient grounds to support claims of willful patent infringement.

The Eastern District Court found HTC's policy of ignoring others' patents opened the door for support of Motiva's assertions that HTC willfully infringed upon Motiva's patents. The court stated that intentionally being blind to the facts was essentially the same as knowing about a competitor's patent and infringing on it anyway.

The basic principle of "ignorance of the law is no excuse" applies to patent infringement—as the defendant in a Texas patent case discovered.

Contributory infringement – otherwise known as 'indirect infringement' or 'infringement by supply' includes actions that contribute (or potentially contribute) to someone else infringing a patent, even if those actions do not directly infringe the patent.

When Intel imports, sells or offers to sell a component or part [Intel's CPU, Chipset, Processor, or SoC] that's used exclusively for a patented item [Plaintiff's CMDC devices—new and improved desktop PC; laptop; tablet, etc.] or process, is likely contributorily liable. Intel do not have to be involved in the sale, manufacture or use themselves to be liable.

The Claim Chart included above identifies how Intel has likely contributed to the infringement of Plaintiff's patents. The violations are too massive to be considered coincidental.

**Plaintiff is Alleging, Intel is Engaging in a "Systematic Campaign" of Illegal Conduct to Protect Its Monopoly; and, Plaintiff's "Alleged Injuries Flow from the Alleged Harm to Competition.**

Intel's history of antitrust investigators and lawsuits is retrieved from: *Intel and antitrust: A brief history. FTC complaint against Intel latest in long list of events*: By Network World staff and IDG News Service; Network World | DEC 16, 2009 12:00 AM PST

"The Federal Trade Commission's antitrust lawsuit against Intel marks the latest development in one of several antitrust cases that have dogged the world's largest chip maker for years. Here's a rundown of Intel's brushes with antitrust investigators and lawsuits around the world since 1990:

**1990**

Dec. 19: Microprocessor maker Cyrix filed an antitrust lawsuit against Intel in the U.S. District Court of the Northern District of Texas. "Intel has engaged in a campaign of unlawful exclusionary practices to protect its coprocessor monopoly from competition by Cyrix," the company said in a statement.

**1991**

June 29: The U.S. Federal Trade Commission (FTC) informed Intel that it was investigating the company's business practices.

Aug. 20: Advanced Micro Devices brought a $2 billion antitrust lawsuit against Intel in the U.S. District Court of the Northern District of California, alleging that Intel "engaged in unlawful acts designed to secure and maintain a monopoly."

Dec. 19: U.S. District Court Judge James Ware dismissed part of AMD's antitrust lawsuit against Intel because a four-year statute of limitations had passed for some actions listed in AMD's complaint. AMD declared its intention to press forward with the lawsuit anyway.

May 28: Processor maker Chips and Technologies sued Intel for antitrust violations in the U.S. District Court of the Northern District of California. The claims were a response to a February 1992 patent lawsuit filed by Intel.

**1993**

Feb. 4: Chips and Technologies agreed to dismiss its 1992 antitrust claims against Intel as part of a settlement to resolve a patent dispute between the two companies.

July 15: The FTC completed its investigation into Intel's business practices, saying no evidence was found to support charges of anticompetitive behavior.

**1994**

Feb. 4: Cyrix dismissed its 1990 antitrust claims against Intel as part of a patent-dispute settlement between the two companies.

**1995**

Jan. 11: AMD and Intel announced a broad legal settlement that ended several court cases between the two companies, including the 1991 antitrust lawsuit filed by AMD.

**1997**

Aug. 27: The FTC requested additional information from Intel concerning its plans to acquire Chips and Technologies, citing antitrust laws. At the time, Chips and Technologies was a major supplier of graphics chips.

Sept. 25: The FTC began a second antitrust investigation into Intel's business practices. This investigation was conducted separately from the review of Intel's offer to acquire Chips and Technologies.

**1998**

Jan. 13: The FTC decided not to seek an injunction against Intel's acquisition of Chips and Technologies but announced plans to "continue the investigation into the lawfulness of the acquisition."

April 23: The FTC ruled that an October 1997 legal settlement between Intel and Digital Equipment that included the sale of Digital Equipment's semiconductor division, including its Alpha processor, to Intel would violate U.S. antitrust law if completed. As a result, the FTC required Digital Equipment to offer licenses for its Alpha processor to both AMD and Samsung Electronics as part of the deal.

June 8: The FTC issued an antitrust ruling against Intel. The FTC found that Intel stopped providing important technical information about its products to Digital Equipment, Compaq

17

Computer and Intergraph after the three companies took legal action against Intel to enforce microprocessor patents they held. Intel also threatened to stop selling microprocessors to those companies, the FTC said.

**1999**

March 17: The FTC accepted a settlement with Intel over the 1998 antitrust ruling. The agreement required Intel to refrain from withholding technical information from customers involved in intellectual-property litigation with the company, but did not constitute an admission of guilt on the chip maker's part.

**2000**

Sept. 26: The FTC ended its second investigation into Intel's business practices and decided to take no further action against the company.

**2004**

April 8: The Fair-Trade Commission of Japan (JFTC) raided the offices of Intel's Japanese subsidiary and several Japanese computer companies as part of an investigation into Intel's business practices.

**2005**

March 8: JFTC ruled that Intel violated Japanese antitrust laws and hurt competition in the country's processor market.

March 31: Intel disputed the JFTC's findings, but did not contest them and agreed to refrain from certain business practices.

June 27: AMD filed an antitrust lawsuit against Intel in the U.S. District Court for the District of Delaware. The lawsuit detailed allegations of anticompetitive behavior by Intel in the United States, Asia and Europe.

June 30: AMD sued Intel in the Tokyo High Court and the Tokyo District Court, seeking more than $50 million in damages arising from the chip maker's anticompetitive actions in Japan.

July 12: European Commission investigators raided the offices of Intel and PC manufacturers in several countries as part of an antitrust investigation.

**2006**

Feb. 9: Korean Fair-Trade Commission (KFTC) officials raided Intel offices in South Korea.

July 17: AMD filed a complaint against Intel with Germany's Federal Cartel Office, claiming that a deal between Intel and retailer Media Markt blocked the sale of computers based on AMD processors at hundreds of retail outlets.

Sept. 11: European Commission antitrust officials announced plans to investigate the complaint filed in Germany by AMD against Intel and Media Markt.

**2007**

July 27: The European Commission charged Intel with antitrust violations. It accused Intel of offering rebates to PC manufacturers that buy the majority of their processors from Intel, paying PC manufacturers to delay or cancel products based on AMD processors, and selling processors below cost when bidding against AMD for contracts with server makers.

Sept. 12: The KFTC issued preliminary antitrust charges against Intel while continuing its investigation into the company's business practices in South Korea.

**2008**

Jan. 10: The New York State Attorney General launched an antitrust investigation of Intel. The chip maker was served with a subpoena seeking information on its pricing practices and "possible attempts to exclude competitors through market domination."

Feb. 12: European Commission investigators raided Intel's office in Munich. The offices of retailers Media Markt and DSG International were also raided by investigators.

June 6: The U.S. Federal Trade Commission served a subpoena to Intel, opening another antitrust investigation into the chip maker. Intel says it will work cooperatively with the FTC to provide information.

July 17: The European Commission leveled another set of antitrust charges against Intel, saying "that Intel has infringed rules on abuse of dominant position with the aim of excluding its main rival AMD from the x86 central processing units' market."

**2009**

May 13: The European Commission finds Intel guilty of antitrust violations in the PC microprocessor market and fines the company $1.44 billion, saying Intel's actions harmed millions of European consumers. The main antitrust abuses involved paying rebates to system manufacturers and to Europe's largest IT retailer, Media Markt, in order to shut out Intel's closest rival, AMD.

July 22: Intel appealed the $1.44 billion fine in a European court.

Nov. 4: New York Attorney General Andrew Cuomo filed a federal antitrust lawsuit against Intel in the U.S. District Court in Delaware, alleging that company engaged in a "systematic campaign" of illegal conduct to protect a monopoly. Cuomo alleged that Intel extracted exclusive agreements from large computer makers and threatened to punish those perceived to be working too closely with Intel competitors.

Nov. 12: Intel and AMD settled all antitrust litigation and patent cross-license disputes the companies had with each other. Intel agreed to pay AMD $1.25 billion, while agreeing to a set of business practice provisions and a five-year cross-licensing agreement. AMD agreed to drop all regulatory complaints and pending legal disputes against Intel, but the settlement does not prevent other organizations from pursuing legal action against Intel.

Dec. 16: U.S. Federal Trade Commission filed antitrust lawsuit against Intel, alleging that Intel has waged a "systematic campaign" to cut off rivals' access to the marketplace and prevent adoption of superior products produced by competitors.

**2010**

On 12/16/2010: Plaintiff's notice letters and licensing offer was mailed U.S. Postal Service, Certified Mail to Mr. Paul S. Otellini, President & CEO Intel, and Mr. Curt J. Nichols, VP Intel Capital Intel, at Mission College Blvd., Santa Clara, CA 95054-1549. Intel received and signed for the letters 12/20/2010. Phone: 408-765-8080. Tracking Nos: 7010 1870 0002 0193 0360 and 7010 1870 0002 0193 0377. (Attached as **Exhibit A** to this document; and, attached in this Case 5:22-cv-03828-NC, at Dkt. 1-7; filed 06/28/22)

**2010 - 2022 (12 years)**

Plaintiff has patiently waited on Intel for twelve years to cease and desist making, using, offering for sell, or selling products that Intel was notified on 12/16/2010 is the intellectual property subject matter that is covered in Plaintiff's patents.

Plaintiff has patiently waited on Intel for ten years [2012-2022] to initiate a challenge to Plaintiff's patents at the PTAB. The procedure for conducting *inter partes review* took effect on Sep. 16, 2012, and applies to any patent issued before, on, or after Sep. 16, 2012. Plaintiff has asserted 45 patent claims of 7 patents in this case that Intel could have challenged at the PTAB:

- Plaintiff's 7,385,497 ('497 patent) issued on 06-10-2008: [ind. claim 1 that covers a threat-detection device that is placed in, on, upon or adjacent the monitoring equipment—CMDC devices of at least a monitoring computer PC; desktop PC; laptop]

- Plaintiff's 8,106,752 ('752 patent) issued on 01-31-2012: [ind. claim 10 that covers a threat-detection device that is placed in, on, upon or adjacent the monitoring equipment—CMDC devices of at least a monitoring computer PC; desktop PC; laptop]

- Plaintiff's RE43,891 ('891 patent) issued on 01-01-2013: [ind. claim 44 and dep. claims 45 - 55 that includes "products grouped together by common features and design similarities"—Stall, Stop, Vehicle Slowdown (SSVS) Systems of at least a pre-crash (SSVS); unintended acceleration (SSVS); driverless and autonomous vehicle (SSVS); brake override (SSVS)]; adjusted cruise control (SSVS); vehicle stabilization (SSVS); lane departure (SSVS); remote (SSVS); pre-programed (SSVS)]

- Plaintiff's 9,096,189 ('189 patent) issued on 08-04-2015: [ind. claims 1 - 9 that includes "products grouped together by common features and design similarities"—CMDC devices of at least a monitoring computer PC; desktop PC; laptop, cell phone; smartphone]

- Plaintiff's 9,589,439 ('439 patent) issued on 03-07-2017: [ind. claims 13 - 23 that includes "products grouped together by common features and design similarities"—CMDC devices of at least a monitoring computer PC; desktop PC; laptop, cell phone; smartphone]

- Plaintiff's 10,163,287 ('287 patent) issued on 12-25-2018: [ind. claims 4 - 6 that includes—CMDC devices of at least a monitoring computer PC; desktop PC; laptop, cell phone; smartphone that comprises a central processing unit (CPU). The CPU is considered the "brains" of the devices and without one the device cannot function]; and,

- Plaintiff's 10,984,619 ('619 patent) issued on 04-20-2021: [ind. claims 1 & dep. claims 2 – 10; ind. claims 11 & dep. claims 12 – 20 that includes—CMDC devices of at least a monitoring computer PC; desktop PC; laptop, cell phone; smartphone that comprises a

central processing unit (CPU). The CPU is considered the "brains" of the devices and without one the device cannot function]

Intel failed to specifically respond to Plaintiff's notice letters and licensing offer; Plaintiff's cease and desist request; and, fail to challenge Plaintiff's patents at the PTAB. Therefore, when Plaintiff states he has the patent rights to exclude Intel from making, using, offering for sell, or selling Plaintiff's patented desktop PCs; laptops, cell phones; or smartphones, it should be taken as fact because Intel had 12 years to dispute Plaintiff's claims, but never did.

## Intel is Engaged in a "Systematic Campaign" of Illegal Conduct to Protect Its Monopoly

The U.S. Federal Trade Commission: "Intel has engaged in a deliberate campaign to hamstring competitive threats to its monopoly," Richard Feinstein, director of the FTC's Bureau of Competition, said in a statement. "It's been running roughshod over the principles of fair play and the laws protecting competition on the merits. The commission's action [] seeks to remedy the damage that Intel has done to competition, *innovation*, and, [] the American consumer."

According to the information presented in the previous section about Intel's history of being engaged in a "systematic campaign" of illegal conduct to maintain its monopoly, has harmed competition and enabled Intel to unjustly enrich itself.

Defendant wants this Court to believe Plaintiff's claim is *frivolous*. A frivolous claim, often called a bad faith claim, refers to a lawsuit, motion or appeal that is intended to harass, delay or embarrass the opposition. Considering Intel's history, Plaintiff claim has merit.

A claim is frivolous when the claim lacks any arguable basis either in law or in fact *Neitze v. Williams*, 490 U.S. 319, 325 (1989). That means, in a frivolous claim, either: (1) "the 'factual contentions are clearly baseless,' such as when allegations are the product of delusion or fantasy;" or (2) "the claim is 'based on an indisputably meritless legal theory'." *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998).

Plaintiff certifies that to the best of Plaintiff's knowledge, information, and belief, formed after reasonable inquiry, that this complaint against Intel, is not frivolous, and is well-grounded in fact and is warranted by existing law, and that it is not interposed for any improper purpose, such as to harass or to cause frivolous litigation.

# RELIEF

Plaintiff is seeking summary judgement against Intel for contributory infringement and unjust enrichment. Under Federal Circuit precedent, indirect (contributory) infringement requires a patent owner [Plaintiff] to show that the alleged infringer [Intel] had the specific intent to cause direct infringement. Plaintiff has satisfied this requirement.

The Federal Circuit has essentially broken the statute for contributory infringement down into four elements. More specifically, in order to establish contributory infringement, the court has held that a patent owner [Plaintiff] must show: (1) that there is direct infringement, (2) that the accused infringer [Intel] knew that the combination for which its components were being made was both patented and infringing, (3) that the component has no substantial noninfringing uses, and (4) that the component is a material part of the invention. *Fujitsu*, 620 F.3d at 1326 and 1330. The second element was essentially reaffirmed by the Supreme Court in Global-Tech, which stated that § 271(c) requires knowledge (**Exhibit F**) of the existence of the patent and knowledge that the component infringes. *Global-Tech*, 131 S. Ct. at 2069.

Pursuant to FRCP Rule 56: Plaintiff has shown that there is no genuine dispute as to any material fact of Plaintiff's claim that Intel has unjustly enriched itself with the use of Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices (i.e., "… of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal … monitoring products for communication therebetween, …."; and, Plaintiff's central processing units (CPUs), i.e., the "brains" of the CMDC devices. Plaintiff is entitled to judgment as a matter of law.

A. Summary judgement on the merits of the case for Intel's single-firm anticompetitive conduct (under section 2 of the Sherman Act), and unjust enrichment.

B. Summary judgement on the merits of the case for contributory infringement; and willful infringement.

C. Summary judgement on the merits of the history of Plaintiff's patent prosecution and challenges; that Plaintiff's patents and patent claims are valid.

D. Damages found or assessed for Intel's single-firm anticompetitive conduct (under Section 2 of the Sherman Act), that has cause Antitrust injury to the Plaintiff, in the amount of $20 billion dollars. $20B is only **1.8%** of the total revenue ($1.131T) Intel received for the years 2010-2021, plus the projected amount Intel will receive for years 2022-2026.

E.  Damages found or assessed for contributory infringement that has cause injury to the Plaintiff, in the amount of $20 billion dollars. $20B is only **1.8%** of the total revenue ($1.131T) Intel received for the years 2010-2021, plus the projected amount Intel will receive for years 2022-2026.

F.  Trible damages for the Antitrust injury imposed by Intel for violating Federal Antitrust Laws (Section 4 of the Clayton Act, 15 U.S.C.S. § 15, provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue" for treble damages, prejudgment interest, and costs of suit, including attorney fees.

G.  The Court orders Intel to establish, at minimum, a $20 billion dollar reserve with the SEC for "Probability of the Incurrence of a Loss". The reserve is returned to Intel if found not liable.

Sincerely,

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 26th day of September, 2022, a true and correct copy of the foregoing "Plaintiff's Response to Defendant's Motion to Dismiss and Plaintiff's Notice of Authority in Support of Plaintiff's Cross-Motion for Summary Judgement", was served upon the following Defendant by priority "express" mail:

Richard Tyler Atkinson

McManis Faulkner

50 West San Fernando Street, 10th Floor

San Jose, CA 95113

Phone: (408) 279-8700

Fax: (408) 279-3244

Email: tatkinson@mcmanislaw.com


Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605